2025 IL App (1st) 240953-U

FIRST DIVISION
July 28, 2025

No. 1-24-0953

NOTICE: This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | |
| | ) | Appeal from the |
| Respondent-Appellee, | ) | Circuit Court of |
| | ) | Cook County. |
| v. | ) | |
| | ) | No. 06 CR 2659801 |
| TRISTAN SCAGGS, | ) | |
| | ) | Honorable |
| Petitioner-Appellant. | ) | Michael R. Clancy, |
| | ) | Judge Presiding. |
| | ) | |

PRESIDING JUSTICE FITZGERALD SMITH delivered the judgment of the court. Justices Lavin and Cobbs concurred in the judgment.

**O R D E R**

¶ 1 *Held*: The circuit court's denial of the petitioner's *pro se* request for leave to file his successive postconviction petition is affirmed, where the petitioner failed to establish cause for not raising his youth-based proportionate penalties challenge in an earlier proceeding.

¶ 2 The petitioner, Tristan Scaggs, appeals from the circuit court's order denying his *pro se*

motion for leave to file his successive postconviction petition pursuant to the Post-Conviction

Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2020)). On appeal, the petitioner contends that he sufficiently established cause and prejudice with respect to his as-applied proportionate penalties' challenge to his 38-year sentence, imposed for a crime he committed when he was 19 years old (see Ill. Const. 1970, art I, § 11). The petitioner acknowledges that his sentence is less than 40 years' imprisonment, such that it does not fall squarely within our supreme court's definition of what constitutes a *de facto* life sentence (*People v. Buffer*, 2019 IL 122327, ¶¶ 27, 40-41) but nonetheless argues that under his very unique circumstances because he has only one kidney that is now in renal failure, he is unlikely to survive that sentence. For the following reasons, we affirm.

¶ 3                                I. BACKGROUND

¶ 4     Because the procedural history of this case and the evidence adduced at the petitioner's trial are fully articulated in our decisions addressing the petitioner's direct appeal (*People v. Scaggs*, 2011 IL App (1st) 090666-U), and the dismissal of his initial postconviction petition (*People v. Scaggs*, 2021 IL App (1st) 173017-U), we set forth only those facts relevant to the resolution of the issues raised here.

¶ 5     This cause of action stems from an incident that occurred on October 30, 2006, after which the petitioner and two codefendants (Melvin Martin and Lamel Burns) were arrested and charged with, *inter alia*, felony first degree murder, attempt murder of a peace officer, and conspiracy to commit murder. According to the indictment, the petitioner entered into an agreement with codefendants Martin and Burns to kill the victim, Dwandric McDowell, and, in the course of this, pointed a gun at a police officer, which led to the deaths of two additional coconspirators, Marcus Thomas and William Tyler, who were killed at the scene.

¶ 6     The petitioner proceeded to a jury trial at which the following summarized evidence was

adduced. In the summer of 2006, the New Breeds and the Traveling Vice Lords street gangs were engaged in a violent gang war. McDowell was a ranking member of the Traveling Vice Lords, while codefendants Burns and Martin were ranking members of the New Breeds. Thomas and Tyler were also members of the New Breeds, while the 19-year-old petitioner was merely "an associate."

¶ 7     In October 2006, the police were given permission to conduct a wiretap of the codefendants' cell phones and were monitoring a black Pontiac Grand Prix, which had been reported stolen. On October 30, 2006, the police intercepted several phone conversations between the codefendants and the petitioner, which led them to believe that the codefendants and the petitioner were looking for McDowell to kill him. At about 6 p.m., the police, led by Lieutenant Joseph Gorman, decided to stop the Pontiac Grand Prix.

¶ 8     The two officers who were first on the scene, Lieutenant Gorman and Sergeant James Sanchez, testified that as they approached the vehicle, they saw three men inside. Tyler was in the driver's seat, the petitioner was in the front passenger seat, and Thomas was in the back. As Sergeant Sanchez, armed with a shotgun, approached the driver's side of the vehicle from the front, he saw Tyler, who was wearing latex gloves, lean back, reach for his waistband, and yell "[g]et these b*tches." Sergeant Sanchez did not see the petitioner with a gun but noticed that Thomas, who was sitting in the back, had latex gloves in his pocket. At the same time, Lieutenant Gorman approached the rear driver's side of the vehicle. He saw a barrel of a rifle breaking the window of the back seat and yelled that there was a gun. The two officers then repeatedly shot at Thomas and Tyler, both of whom died at the scene. The officers later retrieved a rifle from Thomas' hand but did not find any weapons on Tyler.

¶ 9     Sergeant Michael Bocardo, who arrived at the scene after Lieutenant Gorman and Sergeant

Sanchez, heard gunfire and then saw the petitioner exit the Pontiac Grand Prix and approach him. The petitioner was wearing latex gloves and holding a gun. According to Sergeant Bocardo, the petitioner ignored his order to drop the weapon and instead raised his gun in his direction. "[B]eliev[ing]" that the petitioner had shot him, Sergeant Bocardo fired at the petitioner twice. The petitioner fell to the ground but continued to raise his gun at the sergeant, so the sergeant shot him again. Sergeant Bocardo testified that it was not until he approached the immobilized petitioner on the ground that he realized that the petitioner had a hole in his back. The parties stipulated that the petitioner was shot in the back, and that even after surgery, the bullet remains lodged in his right hip.

¶ 10    On cross-examination, Sergeant Bocardo admitted that at the time he shot the petitioner, the petitioner's torso was not facing him. He also admitted that before the petitioner exited the Pontiac Grand Prix, another detective opened the front passenger side door for him, whereupon the gunfire erupted. That officer, however, did not testify at the petitioner's trial.

¶ 11    Detective James Egan, who did not witness the shooting, testified that when he arrived at the scene, the petitioner was lying on the ground about to be put into handcuffs. Detective Egan pulled a .9-millimeter handgun from underneath the petitioner's left side.

¶ 12    Forensic evidence established, *inter alia*, that all 69 shell casings that were recovered from the scene came from weapons belonging to the police. Also recovered were a rifle and a .9-millimeter pistol with a magazine and six unfired cartridges. Testing confirmed that while both Tyler and Thomas, who were now deceased, could not be excluded from the DNA profiles that were extracted from that rifle and pistol, the petitioner was excluded, as his DNA was not on either weapon.

¶ 13    Based on this evidence, the jury acquitted the petitioner of felony first degree murder but

4

found him guilty of conspiracy to commit murder and attempt murder.

¶ 14    At the subsequent sentencing hearing, the parties offered evidence in aggravation and mitigation. The State sought the imposition of the maximum 80-year sentence for attempt murder.[1] The State argued that the petitioner's conduct was gang-related and had threatened the public with serious harm. Relying on the presentence investigation report (PSI), the State also pointed out that the petitioner's criminal history included one prior felony drug arrest for manufacture/delivery of less than 15 grams of heroin, for which he was out on bond prior to committing the instant crime, and for which he was subsequently convicted and sentenced to six years imprisonment (No. 06 CR 1113901). The State also noted that while awaiting trial in the instant matter, the petitioner had acquired two additional convictions for possession of cannabis in a penal institution (see Nos. 07 CR 1868804, 08 CR 0397701) for which he was sentenced to two and three years respectively. The State, therefore, asserted that the maximum sentence was required to deter the petitioner's future criminal conduct, as he "clearly doesn't behave himself [even] when he is in a custodial situation."

¶ 15    Defense counsel, on the other hand, asked the trial court to impose the minimum 20-year sentence. According to counsel, the petitioner was not beyond rehabilitation because he had attended high school and had no prior felony convictions or adjudications before the instant case. In support, counsel offered two letters from the petitioner's family proclaiming his good character,

---

[1]Because the petitioner was charged and convicted of attempt first degree murder of a peace officer, he was subject to a sentence between 20 to 80 years' imprisonment (720 ILCS 5/8-4(c)(1)(A) (West 2006)) rather than the sentencing range of 6 to 30 years' imprisonment for attempt first degree murder. *Id*. § 8-4(c)(1); 730 ILCS 5/5-4.5-25 (West 2006)).

asking for leniency, and offering to look after him upon release.

¶ 16    Defense counsel also argued that the petitioner had neither facilitated nor planned the instant crime but was present at the scene only because he had been instructed and led there by "frightening" high ranking members of the New Breeds. Counsel also pointed out that the petitioner was "a fatherless child," who grew up around the New Breeds, which was "almost a formula for him to end up where he [wa]s sitting right now." He was "a youth with really no, no guidance whatsoever."

¶ 17    Defense counsel also argued that the petitioner had not shot at anyone and therefore did not endanger or pose any threat to the public, but was, instead, shot by the police. What is more, counsel argued, as a result, the petitioner had suffered serious medical injuries, which necessitated his hospitalization for over a month. As counsel pointed out, it was undisputed that the gunshot wound to the petitioner's back resulted in the petitioner losing his right kidney and required him to undergo open heart surgery to remove fluid buildup around his heart. Furthermore, since then, the petitioner had suffered from complications arising from his compromised immune system, including swelling to his legs and inflammation of his left kidney. According to counsel, the petitioner must now take nine different medications for his heart and kidney problems. Counsel therefore argued that imprisonment would endanger the petitioner's medical condition.

¶ 18    After hearing the parties' arguments, the trial court sentenced the petitioner to concurrent terms of 38 years for attempt murder and 15 years for conspiracy. In doing so, the court acknowledged that as a result of the shooting, the petitioner had serious physical infirmities but found that imprisonment would not endanger his medical condition and that a significant period of incarceration was necessary to safeguard the public. As the court explained, because this was "a gang related case *** there may be some members of that organization to which [the petitioner]

6

belongs that would benefit by seeing a severe sentence handed down." The court also found relevant that the petitioner's criminal history included a prior arrest for a drug offense, as well as two subsequent convictions for possession of cannabis, which the petitioner had acquired while in custody awaiting trial. As the court explained, "[m]ost of [his] adult life here [the petitioner has] been making bad decisions."

¶ 19    On direct appeal, we reversed the petitioner's conviction for conspiracy to commit murder, vacating that portion of his sentence, but affirmed his conviction and sentence for attempt murder. See *Scaggs*, 2011 IL App (1st) 090666-U, ¶ 90. In doing so, we found that the trial court committed reversible error by admitting hearsay wiretapped phone conversations between Tyler, Thomas, Burns, Martin, and the petitioner, regarding their plans to find and kill McDowell without any independent proof demonstrating a conspiracy involving the petitioner. *Id.*, ¶ 30.

¶ 20    On April 29, 2013,[2] the petitioner filed his first postconviction petition, alleging ineffective representation. The petitioner argued that his appellate counsel was ineffective for failing to argue that he was entitled to a new trial on the attempt murder charge based on the admission of the same wiretap evidence that was used to convict him of conspiracy to commit murder. In addition, the petitioner argued that his trial counsel was ineffective for failing: (1) to call witnesses to impeach Sergeant Bocardo, by testifying about the petitioner exiting the vehicle and complying with the officer's orders; (2) to investigate Seargent Bocardo's past misconduct; and (3) to raise a due process challenge or request an adverse instruction based on the State allowing the Pontiac Grand Prix to be destroyed despite a preservation order. After the circuit court dismissed the petition at the second stage of postconviction proceedings, we affirmed. See *Scaggs*, 2021 IL App (1st)

---

[2] The petition was amended on March 15, 2016.

173017-U, ¶¶ 34-83.

¶ 21    On November 28, 2022, the petitioner filed the instant verified *pro se* motion for leave to file his successive postconviction petition. Therein the petitioner solely argued that his 38-year sentence, imposed for an offense that he committed when he was 19 years old, without proper consideration of his youth and its attendant characteristics violated the Illinois proportionate penalties clause. (Ill. Const. 1970, art. I, § 11). The petitioner acknowledged that, under our supreme court's holdings, his 38-year sentence, which is to be served at 85%, is not a *de facto* life sentence. *Buffer*, 2019 IL 122327, ¶¶ 27, 40-41 Nonetheless, he argued that under his unique circumstances, *i.e.*, his remaining kidney going into renal failure and requiring a transplant, he is unlikely to survive until 56, such that for him 38 years, is in fact, a life sentence.

¶ 22    The petitioner alleged both cause for his inability to raise this claim earlier and prejudice stemming from the imposition of his sentence. With respect to cause, the petitioner argued that the legal and scientific basis for his claim did not exist earlier. Specifically, the petitioner asserted that it was not until 2018, that in *People v. Harris*, 2018 IL 121932, our supreme court acknowledged that the proper vehicle for young adult offenders, such as himself, to raise as-applied youth based proportionate penalties sentencing challenges was via postconviction petitions, and that "[s]tatutory law has only recently *** changed in favor of treating young adults differently when it comes to punishment." See *e.g.*, 730 ILCS 5/5-4.5-115 (West 2019) (offenders under the age of 21, such as the petitioner, are now eligible for parole after serving only 10 or 20 years, depending on their offenses).

¶ 23    In addition, the petitioner argued that the individualized scientific basis for his proportionate penalties' challenge was not available earlier because it was not until 2016 that scientists began to consider the brain development of young adult offenders over the age of 18 in

the context of sentencing. As such, the petitioner argued that he was "only now able to fulfill the Illinois Supreme Court's mandate of showing how the evolving science concerning young adults applie[d] to himself."

¶ 24    In support of this assertion, the petitioner attached a 38-page report prepared on September 3, 2022, by expert developmental psychologist Dr. James Garbarino. In that report, Dr. Garbarino explained that he was not "offering any clinical diagnoses," but rather serving as "an educational witness," and providing "a developmental perspective" regarding the petitioner's "pathway from childhood to adolescence to adulthood" in the context of the new neuroscientific research regarding the evolution of young adult brains, which reveals that the development of brain structure, function, and connectivity continues well throughout an individual's early twenties and impacts both a young adult's thought process and future potential for rehabilitation.

¶ 25    Dr. Garbarino stated that in completing his report he reviewed: (1) the materials in the petitioner's case; (2) the petitioner's records from the Illinois Department of Corrections (IDOC); and (3) his correspondence with the petitioner regarding the petitioner's social history. In addition, Dr. Garbarino administered the Adverse Childhood Experiences (ACE) test, which is a risk assessment tool, endorsed by the Centers for Disease and Control (CDC) that predicts future health and functioning based upon an individual's traumatic childhood experiences. According to Dr. Garbarino, the ACE scale assesses risk factors through a series of ten questions, including inquiries about childhood experiences of physical, sexual, and psychological maltreatment, poverty, domestic violence, household substance abuse, parental separation or divorce, depression or suicide in family members, and family incarceration. The petitioner's ACE score was 9 out of 10, which is worse than 99.9% of the general population.

¶ 26    According to Dr. Garbarino, this score reflected, *inter alia*, some of the following

9

childhood experiences. The petitioner never knew his father and instead lived with his disabled mother, who was deaf from birth and could therefore not obtain employment. There were often nights when there was not enough food. The petitioner's mother was depressed because of her disability and repeatedly threated to kill herself by taking pills. At one point, she was hospitalized for a stress attack and the petitioner had to take care of his siblings by himself for two weeks. When the petitioner was 10 years old, his mother was evicted, and they had nowhere to live. The petitioner moved from place to place, often being passed to different family members for a time, with each new residence located in a worse area of west Chicago, where shootings occurred daily. The petitioner saw a person killed for the first time when he was 10 years old.

¶ 27    The petitioner's grandmother was both physically and verbally abusive to the petitioner. She swore at him, called him stupid, beat him with belts, hangers, and vacuum chords, and even threw a crate at him once. The petitioner was sexually abused by a neighbor when he was 11 or 12 years old. The petitioner's aunt and uncle were heavy crack cocaine and heroin users, and he often found baggies and pipes on the floor or in the bathroom of their home. Because of their rampant drug abuse, his family members were always fighting and stealing from each other. The petitioner was instructed by his family not to talk about his feelings or what was happening in the household because he would be taken away by the Department of Children and Family Services (DCFS).

¶ 28    By age 12, the petitioner joined the Four Corner Hustlers and by age 17 he regularly carried a gun for protection. Gang life was part of the school structure. Everyone the petitioner knew was in a gang. He joined because he did not want to be someone who "could be mistreated." The petitioner started using marijuana at age 11 and ecstasy by age 17 and used both regularly. He liked elementary school but after his best friend was killed in high school, he increasingly got involved in gang life, selling drugs for them. When asked by Dr. Garbarino how he thought his

childhood compared to that of others, the petitioner stated that he only knew how other children around him grew up and they were raised in the same way.

¶ 29     Based on new neuroscientific research regarding the development of young adult brains, and the petitioner's aforementioned social history, Dr. Garbarino opined to a reasonable degree of scientific certainty that the petitioner's immature brain, which was further stunted by severe adversity and childhood trauma, was the crucial factor in the petitioner's behavior in 2006. In fact, according to Dr. Garbarino, the petitioner's brain as experiencing "adolescence squared." In addition, Dr. Garbarino opined that the petitioner lived in "an urban war zone," and therefore had a "war zone mentality," which is reflected in extreme sensitivity or hyper vigilance to both verbal and physical threats, and a high probability of responding to perceived threats with aggression, including preemptive assaults (*i.e.*, "get them before they get me."). Dr. Garbarino concluded that, when combined, these factors made it plausible that the petitioner would be involved in crime, and, in particular, that he would respond the way he did when confronted by the police in 2006.

¶ 30     Dr. Garbarino nonetheless opined that the petitioner was neither "so psychologically damaged as a child that by the time he entered adolescence he was irreparably" stunted in his development and therefore "at a high risk for a lifelong pattern of anti-social behavior and crime," nor so "psychologically damaged" during his incarceration that "he could not take advantage of and profit from opportunities for rehabilitation while in prison." In this respect, Dr. Garbarino noted that in his correspondence with the petitioner, the petitioner acknowledged the destructiveness of his previous actions and no longer looked positively on gang life, which so strongly occupied his youth. Instead, the petitioner was focused on his religion, family, and personal growth. According to Dr. Garbarino, while the petitioner initially joined a gang when he entered prison because he was threatened and wanted to avoid sexual assault, in 2013, at age 25,

11

he disavowed the gang when he converted to Islam. Since then, he has turned to religion and self-improvement, finishing his GED and taking available courses in prison, with the support of his family. The petitioner's IDOC records reflect only four tickets between 2009 and 2020, none of which were for violent behavior. In fact, one of the tickets was for "refus[al] to stop leading prayer on yard," and reflected his devotion to Islam rather than an antisocial attitude.

¶ 31    Dr. Garbarino finally concluded that it is yet to be determined whether the petitioner presently has the psychological resources and social support necessary to make a successful transition from prison to succeed in a positive post-release life.

¶ 32    On February 23, 2024, the circuit court denied the petitioner's request for leave to file his successive postconviction petition, finding that the petitioner's 38-year sentence was not a *de facto* life sentence, and that he failed to establish cause for not raising this claim earlier. The petitioner now appeals.

¶ 33                                II. ANALYSIS

¶ 34    The Act (725 ILCS 5/122-1 *et seq.* (West 2020)) provides a mechanism by which criminal defendants may address substantial violations of their constitutional rights that occurred either at trial or at sentencing. See *People v. Cotto*, 2016 IL 119006, ¶ 26; *People v. English*, 2013 IL 112890, ¶ 22. Because the Act is not a substitute for an appeal, but rather, a collateral attack on a final judgment, issues that were not presented in an original postconviction petition are forfeited and issues that were previously raised and addressed on direct appeal are barred by the doctrine of *res judicata. People v. Clark*, 2023 IL 127273, ¶ 38 (citing 725 ILCS 5/122-3 (West 2014)); see also *People v. Sanders*, 2016 IL 118123, ¶ 24.

¶ 35    Consistent with these principles, the Act contemplates the filing of only one petition without leave of court and codifies the cause-and-prejudice test as the prerequisite to obtaining

such relief. *People v. Lusby*, 2020 IL 124046, ¶ 27; *People v. Edwards*, 2012 IL 111711, ¶ 23; see also 725 ILCS 5/122-1(f) (West 2020). To obtain leave, the petitioner must demonstrate: (1) cause by identifying an objective factor that impeded his ability to raise the specific claim during his initial postconviction proceedings; and (2) prejudice stemming from that failure by demonstrating that the claim not raised in his initial postconviction proceedings so infected the resulting conviction or sentence that it violated due process. 725 ILCS 5/122-1(f) (West 2020). Both elements must be met before a petitioner is permitted to proceed with a successive petition. *Clark*, 2023 IL 127273, ¶ 47 (citing *People v. Davis,* 2014 IL 115595, ¶ 14).

¶ 36    In deciding a motion for leave to file a successive petition the circuit court conducts "a preliminary screening" of the pleadings to determine whether the motion adequately alleges facts that make a *prima facie* showing of cause and prejudice as to each individual claim. *Clark*, 2023 IL 127273, ¶ 47 (citing *People v. Smith*, 2014 IL 115946, ¶ 33). If the petitioner makes such a showing, " 'fundamental fairness requires that an exception be made *** so that a claim raised in a successive petition may be considered on its merits.' " *People v. Griffin*, 2024 IL 128587, ¶ 66 (quoting *People v. Pitsonbarger*, 205 Ill. 2d 444, 459 (2002)). Leave of court is denied "when it is clear from a review of the successive petition and the documentation submitted by the petitioner, that the claims alleged by the petitioner fail as a matter of law or where the successive petition with supporting documentation is insufficient to justify further proceedings." *Smith*, 2014 IL 115946, ¶ 35. Our review of the circuit court's denial of a motion for leave to file a successive postconviction petition is *de novo*. *People v. Bailey*, 2017 IL 121450, ¶ 13.

¶ 37    In the present case, the petitioner challenges the circuit court's denial of his motion for leave to file his proportionate penalties claim contending that he made a *prima facie* showing of both cause and prejudice. With respect to cause, the petitioner solely asserts that he could not have

raised his claim earlier because Dr. Garbarino's expert report analyzing his particular upbringing and circumstances in the context of new neuroscientific research regarding the brain development of young adults was unavailable to him at the time he filed his initial postconviction petition. With respect to prejudice, the petitioner asserts that without this information, the sentencing court had no opportunity to apply the new neuroscientific research to his particular circumstances to determine whether he was more akin to a juvenile than an adult at the time he committed the instant crime and therefore less culpable, such that the imposition of his *de facto* life sentence, violated the Illinois proportionate penalties clause. In this respect, the petitioner acknowledges that under Illinois law his 38-year sentence is not a *de facto* life sentence, *i.e*. a sentence greater than 40 years' imprisonment (*Buffer*, 2019 IL 122327, ¶¶ 27, 40-41), but nonetheless assert that under his very unique circumstances because of his serious medical condition, *i.e*., his remaining kidney going into renal failure and requiring a transplant, he is unlikely to survive that long.

¶ 38    Contrary to the circuit court's ruling, the fact that the petitioner did not receive a *de facto* life sentence by no means prohibits him from arguing that his sentence violated the Illinois proportionate penalties clause. *People v. Spencer*, 2025 IL 130015, ¶ 42 (reiterating that "a defendant may challenge a sentence of any length" and that therefore "the appellate court erred by finding that, because [the defendant] did not receive a *de facto* life sentence, he c[ould not] establish that his sentence violated the proportionate penalties clause."). Nonetheless, for the following reasons, and despite the petitioner's legitimate concerns regarding his health, considering our supreme court's decisions in *Clark*, 2023 IL 127273, and *People v. Moore*, 2023 IL 126461, we are forced to conclude that the petitioner cannot establish the requisite cause for failing to raise this claim in an earlier proceeding.

¶ 39    Under article I, section 11 of the Illinois Constitution, commonly known as the

proportionate penalties clause, "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11. "The mandate set forth in article I, section 11, provides a check on the judiciary, *i.e.*, the individual sentencing judge, as well as the legislature, which sets the statutory penalties." *Spencer*, 2025 IL 130015, ¶ 42. A challenge to the decision of the individual sentencing judge is based upon a defendant's belief that, even though the sentence comports with the sentencing statute, the sentence nonetheless violates the proportionate penalties clause "because the judge failed to set the sentence 'according to the seriousness of the offense and with the objective of restoring the [defendant] to useful citizenship.' " *Id.* (quoting Ill. Const. 1970, art. I, § 11). A sentence violates the proportionate penalties clause when, *inter alia*, the penalty imposed is " 'cruel, degrading, or so wholly disproportionate to the offense as to shock the moral sense of our community.' " *Clark*, 2023 IL 127273, ¶ 51 (quoting *People v. Leon Miller*, 202 Ill. 2d 328, 338 (2002)). We have never defined what constitutes a cruel or degrading sentence because "as our society evolves, so too do our concepts of elemental decency and fairness, which shape the 'moral sense' of [our] community." *Id.* (quoting *Leon Miller*, 202 Ill. 2d at 339).

¶ 40    In Illinois, "emerging adult offenders" (those who are 18 or 19 years old) may raise as-applied proportionate penalties clause challenges to their sentences based on the evolving science on juvenile maturity and brain development. *Spencer*, 2025 IL 130015, ¶ 43; *Clark*, 2023 IL 127273, ¶ 87; *People v. Walker*, 2022 IL App (1st) 201151, ¶ 27 ("our supreme court has held that young adults may rely on the evolving neuroscience and societal standards underlying the rule in *Miller* [*v. Alabama*, 567 U.S. 460 (2012)] to support an as-applied challenge to a life sentence"); see also *e.g.*, *People v. Thompson*, 2015 IL 118151, ¶¶ 43-44 (holding that a 19-year-old defendant was "not necessarily foreclosed" from asserting an as-applied proportionate penalties challenge to

his natural life sentence); *Harris*, 2018 IL 121932, ¶ 48 (concluding that the 18-year-old defendant's as-applied, youth-based proportionate penalties challenge to his 76-year sentence was "more appropriately raised" in postconviction proceedings); see also *People v. House*, 2021 IL 125124, ¶¶ 29-31 (reaffirming that a young adult petitioner, 18 years or older, could make an as-applied challenge to his sentence under the proportionate penalties clause). Our supreme court has instructed that such claims require an adequately developed factual record as to how the evolving science regarding maturity and brain development applies to the petitioner's specific circumstances. *House*, 2021 IL 125124, ¶ 29 (an as-applied challenge to a criminal sentence based on the proportionate penalties clause requires an evidentiary record "relating to how the evolving science on juvenile maturity and brain development applies to [the defendant's] specific facts and circumstances" so that the trial court may make "factual findings critical to determining whether the science concerning juvenile maturity and brain development applies equally to *** [the defendant] specifically.").

¶ 41 Nonetheless, while our supreme court has permitted "emerging adult" offenders to raise such claims in initial postconviction proceedings, its recent decisions have deliberately narrowed the ability of petitioners to do so by way of successive petitions. See *Clark*, 2023 IL 127273, ¶¶ 24-26; *Moore*, 2023 IL 126461, ¶¶ 40-42; *People v. Horshaw*, 2024 IL App (1st) 182047-B, ¶ 51.

¶ 42 Specifically, in *Clark*, our supreme court held that a 24-year-old offender with intellectual disabilities could not challenge his discretionary *de facto* life sentence in a successive petition by simply relying on the unavailability of the decision in *Miller*, 567 U.S. 460, or its progeny. In finding that the petitioner failed to satisfy the cause element of the cause-and-prejudice test, our supreme court first explained that its prior decisions in *Thompson* and *Harris*, opening the door

16

for young adult offenders to raise *Miller*-based proportionate penalties challenges to their sentences, "addressed the possibility of" such challenges "with respect to *mandatory* life sentences in *initial* postconviction petitions." (Emphases in original.) *Id*. ¶ 88 (citing *Thompson*, 2015 IL 118151, ¶ 44 and *Harris*, 2018 IL 121932, ¶ 48). Accordingly, where a petitioner, such as the one in *Clark*, attempted to raise such a claim in a successive petition he first needed to establish cause for failing to raise his claim in his original postconviction petition. *Id*.

¶ 43    Our supreme court next noted that in *People v. Dorsey*, 2021 IL 123010, ¶ 74, it had previously held that " '*Miller*'s announcement of a new substantive rule under the eighth amendment does not provide cause for a [juvenile offender] to raise" a proportionate penalties challenge in a successive petition because, " '[l]ong before *Miller*, Illinois law recognized the special status of juvenile offenders for purposes of applying the principles under the proportionate penalties clause.' " *Clark*, 2023 IL 127273, ¶¶ 61, 92 (quoting *Dorsey*, 2021 IL 123010, ¶ 74). The *Clark* court then elaborated its rationale for its holding in *Dorsey*, stating:

"We reached this conclusion because, long before *Miller*, many cases in this state already recognized that 'courts have discretion to grant leniency to a juvenile even if he or she is prosecuted as an adult.' [Citation.] As far back as 1894, this court recognized that 'there is in the law of nature, as well as in the law that governs society, a marked distinction between persons of mature age and those who are minors. The habits and characters of the latter are presumably, to a large extent as yet unformed and unsettled.' [Citation.] In addition, other Illinois cases have long held that the proportionate penalties clause required the circuit court to take into account the defendant's 'youth' and 'mentality' in fashioning an appropriate sentence. [Citations.]." *Clark*, 2023 IL 127273, ¶ 92.

¶ 44    The *Clark* court recognized that *Dorsey* involved a juvenile offender, *i.e*. one under age

17

18, but found that the "same reasoning" applied to the 24-year-old young adult offender in that case, because Illinois courts "were also aware that less than mature age can extend into young adulthood" and "insisted that sentences take into account that reality of human development." (Internal quotation marks omitted.). *Id.* ¶ 93 (citing *People v. Haines*, 2021 IL App (4th) 190612, ¶ 47). Our supreme court in *Clark* then held that because "*Miller* does not present new proportionate penalties clause principles with respect to discretionary sentencing of young adult offenders" "the essential legal tools" to raise the proportionate penalties argument were available to the young adult offender in that case at the time he filed his initial petition. (Internal quotation marks omitted.) *Clark*, 2023 IL 127273, ¶ 93. The *Clark* court thus concluded that because "*Miller*'s unavailability does nothing to explain why the defendant neglected to raise the proportionate penalties claim in his prior postconviction proceedings," "citing the *Miller* line of cases does not satisfy the 'cause' prong of the cause-and-prejudice test." *Id*. ¶ 94.

¶ 45     Shortly after *Clark*, in *Moore*, 2023 IL 126461, ¶¶ 12, 23, our supreme court reaffirmed that young adult offenders cannot rely on the unavailability of *Miller* to establish the requisite cause for their failure to raise youth-based proportionate penalties challenges in their original postconviction proceedings. In affirming the circuit court's denial of two separate motions for leave to file successive petitions filed by two 19-year-old petitioners, our supreme court held that "[a]s *Miller* does not directly apply to young adults, it also does not provide cause for a young adult offender to raise a claim under the proportionate penalties clause." *Id.* ¶ 42. The court further held that in that case, the evidence and arguments presented at the petitioners' sentencing hearings showed that the petitioners knew that "Illinois law recognized the special status of young adults, especially those subject to adverse influences, for purposes of applying the principes of the proportionate penalties clause." *Id.* Therefore, because "*Miller* did not change the law applicable

to young adults, it [did] not provide cause for the proportionate penalties challenges" advanced by the petitioners' successive postconviction petitions. *Id.*

¶ 46 In the present case, the State asserts that under the holdings in *Clark* and *Moore* the petitioner cannot establish cause for his failure to raise his proportionate penalties argument earlier. The petitioner responds that the State's argument is a red herring because he did not once cite to the unavailability of *Miller* or the *Miller* line of cases in his brief as cause for his failure to raise his proportionate penalties argument earlier. Instead, he points to Dr. Garbarino's expert report as newly discovered evidence, which was unavailable to him during his initial postconviction proceedings. The petitioner argues that Dr. Garbarino's report provides exactly the kind of detailed factual analysis of the petitioner's childhood and traumatic upbringing in the context of recent neuroscientific discoveries regarding the development of young adult brains that our supreme court has signaled is necessary for young adult offenders to raise proportionate penalties claims. See *House*, 2021 IL 125124, ¶ 29. The petitioner further asserts that because Dr. Garbarino's analysis of his circumstances primarily relies on neuroscientific research published in the last decade, the majority of which simply did not exist at the time of his sentencing (in 2008), or when he filed his initial and amended postconviction petition (in 2013 and 2016 respectively), even though he was aware of his own youth and life circumstances, without Dr. Garbarino's expert opinion applying that "modern research" to his particular development, he could not have successfully raised a youth-based proportionate penalties claim in any earlier proceeding. For the following reasons, we disagree.

¶ 47 In *People v. French*, 2022 IL App (1st) 220122, which the State inexplicably fails to cite in its brief, we addressed this same issue and found that a similar individualized expert report by Dr. Garbarino was insufficient to state cause. In that case, which was decided prior to *Clark* and

*Moore*, the 20-year-old petitioner argued "that he established cause 'because his claim [wa]s based on recent, substantive developments in the law, as well as newly obtained factual support for the claim, which could not have been brought in his first post-conviction petition.' " *Id.* ¶ 13. In support, just as here, the petitioner "referenced a report from Dr. James Garbarino detailing [his] 'developmental pathway from childhood to adulthood,' " which he received after filing his initial postconviction petition. *Id.* ¶ 9. Just as here, the court in *French* found that the petitioner had relied on "evolving scientific research regarding young adult offenders, which in turn led [him] to seek the report from Dr. Garbarino to substantiate his claim." *Id.* ¶ 25.

¶ 48    The *French* court held that "[b]ased on *Dorsey*'s clear holding" the petitioner could not establish cause for his failure to raise his proportionate penalties claim in his initial postconviction petition. *Id.* ¶ 25. In doing so, the court considered the distinction between a "lack of supporting caselaw" and a "lack of evidentiary support," and rejected that distinction as a basis for finding "cause." *Id.* ¶ 33. The court explained that "if the caselaw underpinning [the petitioner's] claim does not provide cause, then [the petitioner's] delayed investigation of the claim based on the lack of the caselaw cannot provide cause either." *Id*. The court concluded that "because the Illinois proportionate penalties clause existed long before [the petitioner] filed his initial postconviction petition" he could have "summon[ed] the evidentiary support" and "raised the claim at that time." *Id.* ¶¶ 33-34.

¶ 49    We agree with the rationale of *French* and its interpretation of *Dorsey* and see no way to depart from it. *Clark* and *Moore* both instruct that the claim at issue here "should be viewed as nothing more than an extension of proportionate penalties claims that have existed all along." *Horshaw*, 2024 IL App (1st) 182047-B, ¶ 62 (citing *Dorsey*, 2021 IL 123010, ¶ 74, *Clark*, 2023 IL 127273, ¶¶ 92-93 and *Moore*, 2023 IL 12646, ¶¶ 40-42). Indeed, *Clark* reinforces this

interpretation by clarifying that *Thompson* and *Harris* opened the door only wide enough to accommodate emerging adult proportionate penalties claims raised in initial postconviction petitions. *Clark*, 2023 IL 127273, ¶ 88 (citing *Thompson*, 2015 IL 118151, ¶ 44 and *Harris*, 2018 IL 121932, ¶ 48); see also *People v. Hilliard*, 2023 IL 128186, ¶ 27 (repeating this narrow view and adding that the *Miller*-based proportionate penalties challenge in *House*, 2021 IL 125124, ¶ 5 also involved an initial postconviction petition). As such, the petitioner here cannot establish cause for failing to challenge the constitutionality of his sentence in his original postconviction petition because "a proportionate penalties claim was always available to him in some form." *Horshaw*, 2024 IL App (1st) 182047-B, ¶ 62 (citing *Moore*, 2023 IL 12646, ¶¶ 40-42).

¶ 50    The petitioner's reliance on *People v. Blalock*, 2022 IL 126682 does not lead us to a different result. In that case, the petitioner contended that he satisfied cause for failing to argue that his confession had been coerced because he could not have discovered evidence of a "pattern and practice of police brutality" before his initial postconviction petition. *Id*. ¶ 40. The State, on the other hand, asserted that the petitioner was not precluded from raising this claim earlier because he must have known of his own abuse at the hands of the police at the time when it occurred. *Id*. In agreeing with the petitioner, our supreme court explained that cause is satisfied by "a showing that the factual or legal basis for a claim was not reasonably available" to the petitioner. (Internal quotation marks omitted.) *Id*. ¶ 39. The court then held that because "evidence of a pattern and practice of police misconduct is part of the factual basis of a coerced confession claim" corroborating evidence "external to the defense" is necessary to effectively raise this issue. (Internal quotation marks omitted.) *Id*. ¶¶ 44-45. Moreover, the insidious nature of police abuse makes gathering this type of evidence particularly difficult. *Id*. (quoting *People v. Brandon*, 2021 IL App (1st) 172411, ¶ 57 ("This evidence pertains to the conduct of the State's own agents, toward

unknown individuals, during the investigation of other, usually unrelated, cases. The agents in question *** have every incentive to remain mum, if not deny everything.") Accordingly, without corroborating evidence, a petitioner is impeded from even raising a coerced confession claim. *Id.*

¶ 51    Conversely, "such concerns are absent in a sentencing challenge based on the petitioner's age." *People v. Robinson*, 2025 IL App (1st) 231419-U. "The factual basis for such a challenge is that fully developed adults are different from young adults who are still developing." *People v. Searles*, 2024 IL App (1st) 210043-U, ¶ 17. As our supreme court has continued to reiterate, this distinction is a fact that Illinois courts have long recognized. See *Clark*, 2023 IL 127273, ¶¶ 92-94; *Moore*, 2023 IL 126461, ¶ 42; see also *Haines*, 2021 IL App (4th) 190612, ¶ 47 ("decades before *Harris*, Illinois case law held that the proportionate-penalties clause required the sentencing court to take into account the defendant's 'youth' and 'mentality' "); see also *People ex rel. Bradley v. Illinois State Reformatory*, 148 Ill. 413, 423 (1894) ("There is in the law of nature, as well as in the law that governs society, a marked distinction between persons of mature age and those who are minors" between "the ages of 16 and 21 years;" "the habits and characters of the latter are presumably, to a large extent, as yet unformed and unsettled."). Accordingly, unlike in *Blalock*, the petitioner here did not need any "external" corroborating evidence (*i.e.*, the new neuroscientific research) before he could raise his proportionate penalties claim. See *Dorsey*, 2021 IL 123010, ¶ 73. Instead, he had "the essential legal tools" necessary to make that argument in his initial postconviction petition. *Moore*, 2023 IL 126461, ¶ 42; *Clark*, 2023 IL 127273, ¶ 93; *Dorsey*, 2021 IL 123010, ¶ 73.

¶ 52    In coming to this conclusion, we emphasize that we are far from indifferent to the petitioner's predicament, and recognize that despite all his efforts in obtaining Dr. Garbarino's expert report, which is exactly the kind of evidence our supreme court has signaled is necessary to

support an as-applied youth-based proportionate penalties challenge (see *House*, 2021 IL 125124, ¶ 29), the petitioner has no meaningful path to demonstrate his rehabilitative potential. As such, the earliest he can be released from prison by way of parole is 18 years from now when he will be 56 years old,[3] something that is unlikely to happen because of his present and very serious medical condition. Nonetheless, "we are bound by our supreme court's decisions regarding age-based proportionate penalties challenges for young adults." *Horshaw*, 2024 IL App (1st) 182047-B, ¶ 62. Until our supreme relaxes the cause requirement or our legislature abolishes cause altogether,[4] we are bound to follow the narrow dictates of our supreme court.

¶ 53    Because we find that the petitioner has failed to establish cause, we need not determine whether he made the requisite showing of prejudice. See *People v. Guerrero*, 2012 IL 112020, ¶¶ 15, 22 (affirming the circuit court's denial of a motion for leave to file a successive petition where the petitioner did not establish cause without addressing prejudice because "both element or prongs of the cause-and-prejudice test must be satisfied in order for the [petitioner] to prevail.").

¶ 54                                  III. CONCLUSION

¶ 55    For these reasons, we affirm the circuit court's denial of the petitioner's request for leave

---

[3] The IDOC website, of which we may take judicial notice, currently lists the petitioner's projected parole date as July 6, 2043, and his projected discharge date as July 6, 2046. See *People v. Ware*, 2014 IL App (1st) 120485, ¶ 29 (noting that this court may take judicial notice of information appearing on the IDOC website).

[4] We note that on April 30, 2025, the Illinois senate voted to pass Senate Bill 0248 (SB 0248) (104th Ill. Gen. Assembly Senate Bill 0248, 2025 Sess.), which proposes to amend the Code of Criminal Procedure of 1963 to eliminate the cause element of the cause-and-prejudice test for persons under 21 years old, who seek leave to file a successive postconviction petition claiming violations of the Illinois proportionate penalties clause. This proposed legislation has passed from the Illinois Senate to the Illinois House. As House Bill 1858 (HB 1858) (104th Ill. Gen. Assembly House Bill 1858, 2025 Sess. 2025), it has currently been referred to the House Rules Committee.

to file his successive postconviction petition.

¶ 56    Affirmed.