2025 IL App (1st) 231568-U

No. 1-23-1568

Order filed September 30, 2025

Third Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 97 CR 11558 |
| | ) | |
| DANTE HANDY, | ) | Honorable |
| | ) | James B. Linn, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE LAMPKIN delivered the judgment of the court.
Justices Rochford and Reyes concurred in the judgment.

**ORDER**

¶ 1    *Held*: The trial court's judgment dismissing defendant's successive petition for postconviction relief at the second stage is affirmed.

¶ 2    In 1998, defendant Dante[1] Handy was found guilty of three counts of aggravated criminal sexual assault, aggravated kidnapping, home invasion, two counts of armed robbery, aggravated

_____

    [1] The record contains instances of defendant's first name being spelled as both "Dante" and "Donte." We have opted to use the spelling used by the parties and our prior decisions.

battery, residential burglary, and possession of a stolen motor vehicle. Defendant received a discretionary sentence of four consecutive thirty-year terms of imprisonment to be served at 85%, but after a portion of the sentencing code was found to be unconstitutional, defendant was resentenced to the same term of imprisonment to be served at 50%. Defendant now appeals the dismissal of his third successive petition for postconviction relief under the Post-Conviction Hearing Act (Act) 725 ILCS 5/122-1 *et seq.* (West 2020)).

¶ 3 For the reasons that follow, we affirm the judgment of the trial court.[2]

¶ 4                                    I. BACKGROUND

¶ 5 In 1998, a jury found defendant guilty of three counts of aggravated criminal sexual assault, aggravated kidnapping, home invasion, two counts of armed robbery, aggravated battery, residential burglary, and possession of a stolen motor vehicle. On March 11, 2002, following defendant's conviction, we affirmed the trial court's judgment on direct appeal in an unpublished Rule 23 order. *People v. Handy*, No. 1-98-3010 (unpublished order under Illinois Supreme Court Rule 23). Defendant has since raised multiple collateral attacks against his conviction, and we recite the facts from the underlying offense and procedural history that are necessary for an understanding of this appeal.

¶ 6 On February 23, 1997, defendant and his three codefendants, Sammy Lowery, Derrick Harris, and Erskine DeLoach, all carrying firearms, invaded a family's home at 4 a.m. They robbed the occupants, threatened and hit them at gunpoint, and repeatedly sexually assaulted a 15-year-old girl.

---

[2] In adherence with the requirements of Illinois Supreme Court Rule 352(a) (eff. July 1, 2018), this appeal has been resolved without oral argument upon the entry of a separate written order.

¶ 7    One of the victims, K.W., was sitting in his van waiting for the engine to warm up when all four defendants surrounded his van, ordered him to exit the vehicle at gunpoint, and robbed him of $7 and cigarettes. They compelled him to let them inside and followed him down a hallway with their guns trained on his head to the bedroom where K.W.'s 74-year-old mother, L.W., and his twin 6-year-old daughters were asleep. K.W. turned on the light and told L.W. to wake up. Defendant held a gun to K.W.'s head and forced him to lie down on the hallway floor. The assailants cursed at the twins, threatened to kill K.W., and repeated gang slogans. While defendant held K.W. at gunpoint, Lowery robbed L.W. of $12.

¶ 8    Defendant and one of the other men forced their way into the bedroom of K.W.'s 15-year-old daughter, M.W. The other man pulled her from her bed and brought her into the hallway. Lowery grabbed M.W. and took her into K.W.'s bedroom while defendant returned to holding K.W. at gunpoint. Lowery removed M.W.'s shorts and underwear, exposed his penis, and demanded that she "suck his d***." L.W. forced her way into the bedroom and pulled at Lowery's arms and hands, but Lowery shoved her, causing her to hit the wall, door, and furniture. L.W. continued to struggle with Lowery, who knocked her down, which fractured her finger and bruised her shoulder.

¶ 9    Lowery took M.W. back to her bedroom and attempted to sexually assault her again. L.W. followed and continued to struggle with Lowery, who then dragged M.W. to the kitchen. Defendant, who was still pointing a gun at K.W.'s head, said "I should kill your motherf*** son." While that was occurring, DeLoach and Harris stole the home's VCR and television. Defendant, DeLoach, and Harris eventually urged Lowery that it was time to go, but Lowery insisted that they had to "take the b*** with them." Lowery yanked the family's home phone from the wall and told

the family not to call the police. Lowery then grabbed M.W. and dragged her outside. L.W. followed and Lowery struck L.W. with the hand holding his gun, knocking her into the snow. All four defendants entered K.W.'s van and drove away with M.W.

¶ 10    As one codefendant drove, defendant, Lowery, and a third codefendant took turns repeatedly sexually assaulting M.W., often two at a time. At one point, Lowery penetrated M.W.'s vagina with his penis while defendant forced his penis into her mouth. Defendant then argued with Lowery because he wanted to switch places, repeatedly insisting "I want some too." Lowery and defendant then switched, and Lowery penetrated M.W.'s mouth with his penis and defendant penetrated M.W.'s vagina until he moaned and said he was "coming." Defendant then took over driving while the other three continued sexually assaulting M.W.

¶ 11    M.W. could not recall how many times each of the defendants sexually assaulted her, saying, "It was too many times." Defendant eventually told Lowery to kick M.W. out of the van. When Lowery refused, defendant pointed his gun at M.W. and threatened to shoot her. Lowery asked M.W. multiple times if she wanted to be his girlfriend.

¶ 12    When the van stopped, all four defendants exited the vehicle and M.W. unsuccessfully tried to start the van. Lowery and another codefendant returned to the van and, while the codefendant drove, Lowery sexually assaulted her again. Lowery threatened to kill M.W.'s family if she told anyone what happened. Then he gave her directions home, both men exited the van, and M.W. drove home.

¶ 13    Shoshana Strader lived across the hall from defendant. She returned from a party at 4 or 5 a.m. on February 23, 1997. As she walked up the stairs to her apartment, she saw defendant with a revolver. She asked him where Harris was, but he did not answer. She went into her apartment,

and defendant went into his apartment. Five minutes later, Harris knocked at the front door and came in carrying a television set. Five minutes after that, DeLoach and Lowery came in the back door. Lowery's penis was hanging out of his pants and he said they just finished "f*** this b***." At some point, Strader heard defendant talking through the walls and overheard him say that he had never done anything like that and that he was going to kill himself.

¶ 14 Latrice Riley, DeLoach's then-girlfriend, was staying in Strader's apartment as of February 23, 1997. She asked the codefendants who they had "f***." While pointing a gun at Riley's head, DeLoach denied having "f***" anyone. She asked Lowery, "Why you got your nasty-ass d*** hanging out?" and he replied that he had just "got through f*** the s*** out of some b***." When Riley asked him who he meant, Lowery specified that he meant himself, Harris, and defendant.

¶ 15 Two days later, according to Strader, DeLoach returned to Strader's apartment and Riley accused him of having raped "the girl in the paper." DeLoach replied, "How did you hear about this? You not telling anybody about this are you?"

¶ 16 M.W., K.W., and L.W. eventually viewed photo arrays and all three identified another man other than the four defendants as one of the perpetrators. At later lineups, all three identified Lowery, DeLoach, Harris, and defendant. The fifth individual was never charged.

¶ 17 Defendant was arrested on March 13, 1997, in Texas. Once in custody, defendant agreed to give a statement and have that statement reduced to writing. According to that statement, defendant was drinking and smoking marijuana while driving around with his three codefendants. Codefendants forced K.W. out of his van at gunpoint and went into the house. Defendant followed them and held K.W. at gunpoint while codefendants robbed, threatened, and attacked the family. Defendant wanted to leave and exited the home, using the van's horn to summon the codefendants.

He claimed that he drove while the three other men sexually assaulted M.W. One of the codefendants took over driving and told defendant to "go back there and get you some." While no one else was sexually assaulting M.W., defendant penetrated her vagina with his penis. When Lowery returned and put his penis in M.W.'s mouth, defendant stopped and resumed driving the van. The three codefendants continued to sexually assault M.W., but eventually defendant parked the van and said, "F*** this, I'm out of here." When the codefendants said they should kill the victim, defendant insisted they should let her go. Defendant left the group and ran home and told his girlfriend what happened. A few days later, he fled to Texas.

¶ 18    During trial, however, defendant denied sexually assaulting M.W. and claimed that he did not know of the plan to commit the robbery until it was happening and he did not have a gun during the offense. Defendant claimed he stood in the house, took no part in the offense, and was ready to leave because he did not "want things to go that far as they were going." He claimed that as he drove, he heard a noise and discovered that his codefendants were sexually assaulting M.W. Defendant told Lowery to let her go, but Lowery ordered him to keep driving. After defendant struck some parked cars, Lowery ordered another codefendant to drive. From the front passenger seat, defendant observed Lowery continuing to sexually assault the victim. Defendant insisted that a detective had threatened him, shoved him, and pulled his hair during his interrogation.

¶ 19    M.W. presented to the hospital after the incident due to the pain she was experiencing. An examination revealed that she had a freshly torn hymen, bloodstained mucus inside her vaginal vault, and a swollen labium.

¶ 20    Tracy Gallagher, a forensic scientist, performed DNA testing using the Restriction Fragment Length Polymorphism method on several samples taken from M.W.'s shirt, mouth,

vagina, and rectum. One of the profiles present was a match for Lowery. Another sample matched Harris. For those profiles, the pattern she found would be expected to occur in 1 in 4.2 billion black people and 1 in 14 billion black people, respectively. For other samples, she obtained incomplete results that could have come from Lowery, Harris, and Handy, but the statistical significance of those samples was much lower.

¶ 21    Karla Cluck, a forensic scientist, performed DNA testing on the same samples using the polymerase chain reaction method. The oral and rectal swabs did not exclude defendant, though the statistical significance of the results was low, as Cluck testified that the DNA profile in the oral and rectal swabs would be expected to appear as often as 1 in 4 or 1 in 20 black people, respectively. Cluck also identified another unknown profile that did not match M.W. or any of the defendants.

¶ 22    During the presentence investigation, defendant reported that his childhood was "easy," that his mother took good care of him, and that no one in his immediate family had any substance abuse problems. We affirmed defendant's conviction on direct appeal. *People v. Handy*, No. 1-98-3010 (unpublished order under Illinois Supreme Court Rule 23).

¶ 23    On February 20, 2003, defendant filed a *pro se* petition for postconviction relief. The trial court dismissed it and we affirmed. *People v. Handy*, No. 1-03-1817 (2004) (unpublished order under Illinois Supreme Court Rule 23).

¶ 24    On March 2, 2011, defendant sought leave to file a successive petition, which was denied and we affirmed. *People v. Handy*, 2012 IL App (1st) 111067-U.

¶ 25    On November 21, 2016, defendant once again sought leave to file a successive petition, which claimed that his sentence violated the Eighth and Fourteenth Amendments of the United

States Constitution under *Miller v. Alabama*, 567 U.S. 460 (2012), and *Graham v. Florida*, 560 U.S. 48 (2012). The trial court denied defendant leave to file, and we affirmed as defendant was 18 years old at the time of the offense and therefore could not establish prejudice. *People v. Handy*, 2019 IL App (1st) 170213.

¶ 26    On September 27, 2021, defendant filed the motion for leave to file a successive petition and accompanying successive petition that are now the subject of this appeal. He claimed that changes in the law regarding the proportionate penalties clause of the Illinois Constitution since his last petition now precluded his *de facto* life sentence.

¶ 27    On October 29, 2021, although the trial court did not make an explicit ruling on defendant's motion for leave to file a successive petition, it ordered defendant's petition docketed. The trial court stated it could "glean enough" from recent caselaw that it would docket defendant's petition "just to keep [the] issue available."

¶ 28    On August 8, 2022, the State filed a motion to dismiss, arguing that defendant failed to raise a proportionate penalties challenge at trial and that, in any event, defendant failed to demonstrate that his sentence violated the proportionate penalties clause. The State also argued that defendant's claim was barred by *res judicata*.

¶ 29    At a hearing on February 22, 2023, the trial court denied the State's motion to dismiss. The State subsequently filed a motion to reconsider on August 4, 2023, which argued that our supreme court's decision in *People v. Moore*, 2023 IL 126461, foreclosed defendant's ability to demonstrate cause for his failure to raise his proportionate penalties claim in a previous postconviction proceeding. However, on August 14, 2023, the parties appeared for a hearing at which defendant

planned to present witnesses. The trial court took the State's motion under advisement, but insisted on proceeding with the hearing "in the interest of fairness and justice."

¶ 30    At the hearing, Dr. James Garbarino, a developmental psychologist, testified that he prepared a report about defendant's developmental issues. Dr. Garbarino based that report on defendant's prison disciplinary records, written correspondence with defendant, and defendant's completion of an instrument known as the Adverse Childhood Experience Scale.

¶ 31    Dr. Garbarino testified that it is "settled science now that the human brain cannot be presumed to be mature until the mid 20s, certainly past age 18 into the early 20s." He described that the immature adolescent brain struggles in two areas. One is executive function, or the brain's ability to make decisions, contemplate consequences, and weigh short-term and long-term benefits. The second is affective relation, which refers to our ability to understand one's own emotions and the emotions of others. He further explained that youth have a particularly difficult time making decisions in emotionally charged situations such as when they are sexually aroused, angry, or afraid.

¶ 32    Dr. Garbarino also explained that adversity and negative experience can adversely affect one's emotional development. In the case of defendant's Adult Childhood Experience Scale, defendant reported a childhood history of emotional abuse, physical abuse, sexual abuse, and emotional neglect, as well as living with parental separation and substance abuse. Statistically, only 3 out of every 100 individuals report a history of six or more items on the questionnaire.

¶ 33    These adverse childhood experiences, according to Dr. Garbarino, would have slowed the process of maturation such that at age 18 defendant would behave more immaturely than a typical 18-year-old, and make him more prone to substance abuse, violent delinquent behavior, and

suicidal thoughts. They would also make him prone to negative social influences including peer pressure.

¶ 34    Dr. Garbarino likened these childhood experiences to walking around with a backpack filled with the stones, where the greater the adversity, the more stones are contained in the pack. He described that the process of recovery or rehabilitation involves removing the stones and processing them. He was aware of defendant's participation in prison programs which included stress training, victim impact, trauma management, and various mental health groups. He described defendant as having "devoted many years to this process" and that defendant has "emerged from it a much more complete, positive person who's capable of being released safely in the community and rejoining the community in a positive way." He also believed that defendant's correspondence with him reflected sincere, significant remorse for his crimes.

¶ 35    On cross-examination, he admitted he had never spoken with defendant and had no way of knowing if defendant had assistance drafting his written responses.

¶ 36    Defendant also presented testimony from multiple witnesses who knew defendant in his youth. Cassandra Greer testified that she went to high school with defendant in Englewood and that the area was "infested with gangs" and that defendant joined the Gangster Disciples to fit in. She said defendant never had a stable home and she described him as "very immature" and a "follower." She maintained contact over the years and believed that defendant had matured and taken accountability for his actions.

¶ 37    Kathy Handy, defendant's mother, testified that defendant never knew his father and had been sexually abused by a relative as a child. She also admitted to kicking defendant out of the house during high school after he began using drugs, which forced him to live on the streets.

¶ 38   Defendant testified that he knew of his biological father, but "might have seen him once." Growing up, he lived with his grandmother and two uncles, Carlos and Charles. Carlos hit defendant often, and if defendant cried, he would hit defendant harder. Defendant recounted an instance when he was 12 where he ran home after being chased by other kids in the neighborhood. In response, Carlos made defendant go back outside and fight every kid outside. Defendant described his other uncle, Charles, as a good uncle until Charles began using cocaine. He insisted that he was now focused on making the right choice rather than the popular choice, and that he believed he would not return to the same lifestyle if released.

¶ 39   The trial court issued its ruling on August 21, 2023. During its ruling, the trial court said that "at the second stage, I allowed the presentation of some evidence." The trial court then concluded that defendant's sentence was lawful and stated, "So the State's motion to dismiss at second stage is sustained."

¶ 40   This appeal followed.

¶ 41                                 II. ANALYSIS

¶ 42   There is no denying the procedural oddities of this case that have muddled the otherwise straightforward stages of the Act. On the record before us, the trial court held an evidentiary hearing while also ultimately granting the State's motion to dismiss. This is procedurally impossible. An evidentiary hearing only occurs once a defendant has made a substantial showing of a constitutional violation at the second stage. *People v. Domagala*, 2013 IL 113688, ¶ 34. The denial of a motion to dismiss precedes the filing of an answer and the evidentiary hearing. 725 ILCS 5/122-5 (West 2020).

¶ 43    It appears from the record that the trial court granted defendant's motion for leave to file a successive petition and docketed defendant's petition for second-stage proceedings without explicitly ruling on the question of cause and prejudice. *People v. Sanders*, 2016 IL 118123, ¶¶ 25, 28 (when the requirements for leave to file are met, the successive petition is docketed directly for second-stage proceedings); 725 ILCS 5/122-1(f) (West 2020). And as the State is entitled to do, it sought dismissal on cause-and-prejudice grounds at the second stage. See *People v. Bailey*, 2017 IL 121450, ¶ 26.

¶ 44    In the face of the baffling procedural history of this case, defendant argues that he established cause and prejudice to be granted leave to file a successive petition and that he carried his burden at a third-stage hearing to be granted a new sentencing hearing.

¶ 45    We need not wade into the procedural strangeness of this case or reach the issue of whether defendant successfully proved that he is entitled to a new sentencing hearing because we hold that defendant failed to demonstrate cause and prejudice and that the trial court's decision to dismiss defendant's petition at the second stage was therefore proper. Accordingly, this matter should never have proceeded to an evidentiary hearing.

¶ 46    The Act provides a procedural mechanism through which a defendant may assert a substantial denial of his constitutional rights under the United States Constitution or the Illinois Constitution or both. *People v. Coleman*, 183 Ill. 2d 366, 378-79 (1998); 725 ILCS 5/122-1 (West 2020). A defendant may raise a constitutional challenge to both his conviction and his sentence. *People v. Davis*, 2014 IL 115595, ¶ 13. The Act, however, contemplates the filing of a single petition as a matter of right. *People v. Pitsonbarger*, 205 Ill. 2d 444, 456 (2002); 725 ILCS 5/122-1(f) (West 2020).

¶ 47    Successive petitions are highly disfavored, and the statutory bar will be relaxed only when fundamental fairness requires it. *People v. Holman*, 2017 IL 120655, ¶ 25 (overruled on other grounds by *People v. Wilson*, 2023 IL 127666). A successive filing requires leave of court. *People v. Lusby*, 2020 IL 124046, ¶ 27; 725 ILCS 5/122-1(f) (West 2020). For leave to be granted, a defendant must make a *prima facie* showing of both "cause" and "prejudice" by submitting sufficient pleadings and documentation to permit the trial court to make an independent determination on the legal question raised. *Bailey*, 2017 IL 121450, ¶ 24. The "cause and prejudice" test for successive postconviction pleadings is a higher burden than the "frivolous or patently without merit" standard for initial pleadings. *People v. Edwards*, 2012 IL 111711, ¶¶ 24-29.

¶ 48    The cause-and-prejudice test is a procedural prerequisite to obtaining further review of a defendant's claim. *People v. Bland*, 2020 IL App (3d) 170705, ¶ 9. To show cause, a defendant must identify an objective factor that impeded his ability to raise the claim in his initial petition. *Davis*, 2014 IL 115595, ¶ 14. To show prejudice, a defendant must demonstrate that the claim so infected the trial that the resulting conviction or sentence violated due process. *Id.*

¶ 49    We review *de novo* both the question of whether a defendant demonstrated cause and prejudice and the propriety of a trial court's decision to dismiss a petition at the second stage. *Bailey*, 2017 IL 121450, ¶ 13; *People v. Pendleton*, 223 Ill. 2d 458, 473 (2006). Under the *de novo* standard, a reviewing court performs the same analysis that the trial court would perform, making the question on review whether the trial court's decision was correct as a matter of law. *People v. McDonald*, 2016 IL 118882, ¶ 32. In answering this question, we take as true all well-pled allegations in the petition that are not positively rebutted by the trial record and reject those

allegations that are positively rejected by the trial record. *People v. Robinson*, 2020 IL 123849, ¶ 45.

¶ 50    The proportionate penalties clause of the Illinois Constitution provides that "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. 1, § 11. A sentence violates the proportionate penalties clause if "the punishment for the offense is cruel, degrading, or so wholly disproportionate to the offense as to shock the moral sense of the community." *People v. Leon Miller*, 202 Ill. 2d 328, 338 (2002). The proportionate penalties clause provides broader protections than those provided in the eighth amendment. *People v. Gipson*, 2015 IL App (1st) 122451, ¶¶ 69-78; *People v. Clemons*, 2012 IL 107821, ¶ 36.

¶ 51    Defendant's motion for leave to file a successive petition cited new, evolving case law on the subject of the proportionate penalties clause as it relates to emerging adults as the reason why defendant failed to raise his claims in an earlier postconviction proceeding. However, by the time the trial court granted the State's motion to dismiss on August 21, 2023, the law on this subject had continued to evolve. It will thus be useful to briefly summarize the progression of our proportionate penalties jurisprudence—a topic our supreme court has addressed multiple times in recent years beginning with *People v. Thompson* and *People v. Harris*.

¶ 52    *Thompson* and *Harris* "opened the door for a young-adult offender to demonstrate, through an adequate factual record, that his or her own specific characteristics were so like those of a juvenile that imposition of a life sentence absent the safeguards in *Miller* was cruel, degrading, or so wholly disproportionate to the offense that it shocks the moral sense of the community." *People*

*v. Daniels*, 2020 IL App (1st) 171738, ¶ 25; see *People v. Thompson*, 2015 IL 118151 and *People v. Harris*, 2018 IL 121932.

¶ 53     *Thompson* and *Harris* were followed by *People v. House*, which reaffirmed that *Thompson* and *Harris* "paved the way for young adults to make as-applied challenges to their life sentences using the proportionate penalties clause and the principles contained within *Miller*." *People v. Horshaw*, 2024 IL App (1st) 182047-B, ¶ 50 (citing *People v. House*, 2021 IL 125124, ¶¶ 21-31).

¶ 54     However, since 2021, our supreme court has narrowed the availability of proportionate penalties clause relief in the context of successive petitions. In 2021, *Dorsey* announced for the first time that "*Miller*'s announcement of a new substantive rule under the eighth amendment does not provide cause for a defendant to raise a claim under the proportionate penalties clause." *People v. Dorsey*, 2021 IL 123010, ¶ 74. To support that proposition, it reasoned that "Illinois courts have long recognized the differences between persons of mature age and those who are minors for purposes of sentencing." *Id*. Thus, *Dorsey* concluded that *Miller*'s unavailability prior to 2012 only deprived the defendant of "some helpful support." *Id*.

¶ 55     In 2023, *People v. Clark* held that *Miller* did not present new proportionate penalties clause principles with respect to discretionary sentencing of young adult offenders, and that the defendant "had the essential legal tools" to raise his claim in his initial petition. *People v. Clark*, 2023 IL 127273, ¶ 93. The supreme court clarified that *Thompson* and *Harris* "addressed the possibility of a defendant raising a *Miller*-based challenge with respect to *mandatory* life sentences in *initial* postconviction petitions." (Emphases in original.) *Clark*, 2023 IL 127273, ¶ 88 (citing *Thompson*, 2015 IL 118151, ¶¶ 1, 44, and *Harris*, 2018 IL 121932, ¶¶ 1, 48).

¶ 56    *People v. Moore* followed, in which the supreme court reiterated that "*Miller* does not present new proportionate penalties clause principles with respect to discretionary sentencing of young adult offenders." *People v. Moore*, 2023 IL 126461, ¶ 42. *Moore* reasoned that, "As *Miller* does not directly apply to young adults, it also does not provide cause for a young adult offender to raise a claim under the proportionate penalties clause." *Id*. ¶ 40.

¶ 57    Lastly, *People v. Hilliard* repeated the supreme court's narrow view of *Thompson* and *Harris* by stating, "those cases addressed the possibility of a defendant raising a *Miller*-based challenge with respect to *mandatory* life sentences in *initial* postconviction petitions." (Emphases in original.) *People v. Hilliard*, 2023 IL 128186, ¶ 27 (quoting *Clark*, 2023 IL 127273, ¶ 88).

¶ 58    We recently had occasion to confront the scope of these cases in *People v. Horshaw*, 2024 IL App (1st) 182047-B, and our thorough analysis there is equally applicable here. As we noted there, the First District has adopted a broad interpretation of the above-quoted language used by our supreme court. *Id*. ¶¶ 58-59. Ultimately, we concluded that *Dorsey*, *Clark*, *Moore*, and *Hilliard* all indicate that proportionate penalties claims like the one being raised by defendant here "should be viewed as nothing more than an extension of proportionate penalties claims that have existed all along and that defendant did not need *Miller* or *Miller*-related proportionate penalties precedent to raise the claim now at issue." *Id*. ¶ 62. Furthermore, we reasoned *Clark* and *Hilliard* "reinforced this interpretation by clarifying that *Thompson* and *Harris* opened the door only wide enough to accommodate claims involving mandatory life sentences that were raised in initial postconviction petitions." *Id*.

¶ 59    In *Horshaw*, we expressed our concerns about some of the potential ramifications of the supreme court's decisions, but concluded that we were nevertheless bound by those decisions. *Id*.

¶¶ 60-62. Those concerns have not abated, nor has the legal landscape changed. Defendant's motion, which posits that changes in our proportionate penalties jurisprudence establish cause, is undone by the conclusion that "a proportionate penalties claim was always available to him in some form." *Horshaw*, 2024 IL App (1st) 182047-B, ¶ 63 (citing *Moore*, 2023 IL 126461, ¶¶ 40-42). The cases that defendant cited in his motion, which were *Daniels*, 2020 IL App (1st) 171738; *People v. Ruiz*, 2020 IL App (1st) 163145; *People v. Minniefield*, 2020 IL App (1st) 170541; and *People v. Ross*, 2020 IL App (1st) 171202, all predate the recent shift we have outlined above. In fact, *Hilliard* specifically criticized *Ruiz* and *Minniefield* as they are "contrary to subsequent supreme court decisions and fail to recognize that [the supreme court's] cases were directing the possibility of as-applied proportionate penalties clause postconviction challenges to young adults who received mandatory life sentences." *Hilliard*, 2023 IL 128186, ¶ 28. Defendant's discretionary sentence places him squarely within *Moore*'s holding that "*Miller* does not present new proportionate penalties clause principles with respect to discretionary sentencing of young adult offenders." *Moore*, 2023 IL 126461, ¶ 42. The pathway to relief that defendant identified in his motion has since been closed off by our supreme court for the purposes of successive petitions.

¶ 60     In his brief, defendant insists that his case is distinguishable from *Moore* because he did not rely solely on *Miller*, but also new facts. See *People v. Blalock*, 2022 IL 126682, ¶¶ 42-46 (new factual discoveries can provide cause for a claim in a successive postconviction petition). Defendant's brief points to the testimony of Dr. Garbarino, but the cause and prejudice determination is to be made based on the pleadings. *Bailey*, 2017 IL 121450, ¶ 23. Defendant's motion for leave to file his successive petition is silent as to the discovery of new facts or how they provide cause for his failure to raise his claim in an earlier postconviction proceeding. His motion,

instead, focused entirely on the development of new caselaw. Moreover, defendant's pleading makes no allegations about how the facts contained in Dr. Garbarino's report were previously unavailable or what objective factors prevented him from obtaining that evidence earlier.

¶ 61    While Dr. Garbarino's testimony was informative, that is separate and distinct from the legal question of whether defendant's pleading set out the requisite objective factor that prevented him from raising his claims in an initial petition. It did not. Defendant's allegations about legal cause have been foreclosed by our supreme court, and his motion for leave to file his successive petition contained no allegations about factual cause. Because defendant cannot demonstrate cause, we need not reach his remaining arguments that he demonstrated prejudice, or that he carried his burden at the evidentiary hearing. Accordingly, the trial court's decision to dismiss defendant's petition at the second stage was proper.

¶ 62    Defendant also asks that, if we do not afford him the relief he requests, we remand this case to the trial court to allow the trial court to make a clear ruling on the question of cause and prejudice. Undoubtedly, the course taken by the trial court and, accordingly, the exact nature of its ruling, were perplexing, to say the least. We do not condone the manner in which the trial court handled these proceedings for multiple reasons, the least of which is the fact that it failed to make an explicit cause-and-prejudice ruling. See *People v. Thames*, 2021 IL App (1st) 180071, ¶ 85 (the trial court erred when it advanced a petition to the second stage without making a cause-and-prejudice determination). However, such a remand is unnecessary.

¶ 63    Whether the trial court dismissed defendant's petition on the basis of the State's original motion to dismiss, or the State's motion to reconsider invoking *Moore* and the cause-and-prejudice analysis, our review is *de novo* and we need not base our disposition solely on the trial court's

reasoning. *Bailey*, 2017 IL 121450, ¶ 13; *Mullins v. Evans*, 2021 IL App (1st) 191962, ¶ 25 (we may affirm on any basis in the record). The State raised its cause-and-prejudice objection in the trial court, and both parties have argued this legal issue in the instant appeal. Our determination that defendant failed to establish cause for his successive petition is a sufficient basis to affirm the trial court's dismissal at the second stage, regardless of the trial court's specific reasoning.

¶ 64                                    III. CONCLUSION

¶ 65    For the foregoing reasons, we affirm the trial court's dismissal of defendant's successive postconviction petition at the second stage.

¶ 66    Affirmed.