2026 IL App (1st) 240200-U

FIRST DISTRICT,
SIXTH DIVISION
May 22, 2026

No. 1-24-0200

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County |
| | ) | |
| v. | ) | No. 98 CR 0387301 |
| | ) | |
| RICKY ROBINSON, | ) | Honorable |
| | ) | Carol M. Howard, |
| Defendant-Appellant. | ) | Judge Presiding. |

_____

JUSTICE GAMRATH delivered the judgment of the court.
Presiding Justice C.A. Walker and Justice Pucinski concurred in the judgment.

**ORDER**

¶ 1     *Held*:   We affirm the denial of defendant's postconviction petition after a third-stage evidentiary hearing because the circuit court's credibility findings are supported by the record and defendant did not meet the cause and prejudice requirement for his proportionate penalties claim.

¶ 2     On December 28, 1997, defendant Ricky Robinson shot and killed Nicole Giles pursuant to a plan formulated with two other men and discarded her body in a garbage can. Worried about leaving evidence behind, Robinson returned the next day and set Giles's body on fire. Robinson surrendered to police and confessed soon after. Following a bench trial, Robinson was convicted of first-degree murder, armed robbery, aggravated vehicular hijacking, and concealment of a homicidal death, and sentenced to natural life in prison. Following multiple appeals, this matter is

before us after the circuit court's denial of Robinson's successive postconviction petition asserting actual innocence and a proportionate penalties claim. We affirm the judgment.

¶ 3                                    I. BACKGROUND

¶ 4                                         A. Trial

¶ 5        The evidence at trial is detailed in *People v. Robinson*, 2020 IL 123849, ¶¶ 5-34. We repeat it only to the extent necessary to understand this appeal.

¶ 6        At about 3:30 p.m. on December 28, 1997, Elise Reed made plans with Giles and Robinson for Giles to drive to Robinson's house before picking her up. However, Giles never appeared. Around 5:00 p.m., Anjanette Vance and Lavelle Rogers were in Rogers's car at 88th and Kingston when they saw a dark car facing a nearby viaduct, with two people standing over someone seated on the ground against the driver's side. A third person exited the passenger side and shot the person seated on the ground in the head. The three people put a plastic bag over the victim's head and pulled the body into the back seat of the car. Rogers and Vance flagged down a police officer who saw blood and a shell casing in the street when he went to the scene. Police later found Giles's blue Ford Contour in Homewood with "a lot" of Giles's blood, a plastic bag with hair and blood, and her purse in the backseat.

¶ 7        Leonard Tucker, who was dating Robinson's sister, was present when Robinson returned home around 8:00 p.m. on December 28 with two other men, Marques Northcutt and Peter Andrew Ganaway. When they were alone, Robinson told Tucker he got out of the car and shot Giles in the head, and he and the others put a bag over her head before dumping her body in a garbage can. Tucker warned Robinson that, since he had not worn gloves, his fingerprints would likely be left behind. As Tucker left, Ganaway gave him a pager and later brought him a box of AK-47 ammunition to hide. The next day, Robinson told Tucker, "It's done, we did it, we burned her body" while holding a red gasoline can. On January 7, 1998, Tucker turned over the items to police,

including ammunition and Giles's pager, and reported the conversations he had with the men.

¶ 8        At about 10:30 a.m. on December 29, 1997, Maisha Muhammad spoke with Robinson's sister, who asked if she could borrow their grandmother's car. Five minutes later, Muhammad arrived at Robinson's house in a burgundy Chevrolet Corsica. Muhammad drove Ganaway and Robinson, who had a red gas can, to a gas station at 87th and Exchange, where Robinson filled the can and instructed her to "go under the viaduct." He then directed her to the mouth of an alley, where he and Ganaway got out of the car and walked into the alley with the gas can. Five to ten minutes later, they ran back to the car and Muhammad smelled gas. At Robinson's house, she asked what was happening. Robinson asked if she recalled Nicky, and Muhammad said yes. He continued, "[T]hat's whose body we burned."

¶ 9        On December 29, 1997, at about 11:45 a.m., D'Andre Weaver saw a dark reddish Chevrolet parked near his house. Two men, one with a gas can, left the car for an alley while the driver remained. Soon after, they ran back and drove off, and emergency sirens and smoke appeared from the alley. Weaver later identified Muhammad's grandmother's car in a police photo. The same day, Chicago Police Officer Keith Hill found the remains of a severely charred body covered in debris and melted plastic in a garbage can near 9041 South Luella.

¶ 10        Michelle McClendon testified that on December 28, 1997, she drove Robinson, Northcutt, and Ganaway to Robinson's grandmother's house, where Robinson mentioned shooting Giles, though she did not believe him at first. The next day, the men discussed burning Giles's body, describing how they hid her in a garbage can, poured gasoline, and set it on fire. Later, Robinson told McClendon in detail how the shooting occurred. Although initially skeptical, McClendon began to believe Robinson after seeing news reports of the murder. McClendon later spoke to police and identified a picture of a rifle she had seen twice in the month prior to the shooting, once at Northcutt's home and again at Robinson's house.

¶ 11          Chicago Police Detective Michael McDermott testified that Robinson arrived at the police station with Ganaway on December 30, 1997, and was advised of his rights. McDermott informed Robinson of the status of the investigation, including that witnesses had seen a person up against a car and another person shoot the victim, that the shooting occurred under a viaduct, and that a rifle had been recovered. Robinson then gave a statement that he shot and robbed Giles.

¶ 12          Robinson confessed that he, Northcutt, and Ganaway decided to rob Giles because they believed she would have a large sum of money in her possession. They planned for Robinson to contact Giles and ask her to come over. After she arrived, Robinson asked Giles for her car keys, and he and Ganaway put a semiautomatic rifle in her car. Later, while Giles was driving the three men around, Northcutt told her to pull over so he could urinate. Giles stopped under a viaduct, and Northcutt exited the car. Northcutt "yanked" Giles from the car and she fell to the ground. Robinson exited the car, grabbed the rifle, and shot Giles in the head. They placed a bag over Giles's head, pushed her body back into the car, and Robinson tossed in the gun.

¶ 13          Ganaway drove them from the viaduct to an alley between Crandon and Luella, where they decided to dispose of Giles's body. They removed $50 from Giles's pocket before placing her body in a garbage can. They then drove to a south suburb to abandon the car. After parking Giles's car on a side street near a train station, they took the train back to the city, buying tickets with Giles's money. When he returned home, Robinson put his bloody clothes in the washing machine and discarded his shoes. The next day, after learning that fingerprints could be left on clothing, Robinson and Ganaway decided to return to the garbage can containing Giles's body. Muhammad drove them to a gas station at 87th and Exchange in a maroon Chevrolet Corsica, where Robinson put a dollar's worth of gasoline into a gas can. In the alley, Ganaway poured gasoline into the trash can, and Robinson ignited a gasoline-soaked bandana placed at the top of the can. Robinson's statement also described conversations with Tucker, McClendon, and Muhammad in which he

admitted participating in the shooting of Giles and the burning of her body.

¶ 14     At trial, Robinson did not testify and the defense rested without presenting evidence. The circuit court found Robinson guilty of first-degree murder, aggravated vehicular hijacking, armed robbery, and concealment of a homicide.

¶ 15                              B. Sentencing

¶ 16     Prior to sentencing, the circuit court ordered a pre-sentence investigation (PSI). Robinson refused to participate, explaining he already knew what his sentence would be. In mitigation, defense counsel presented Robinson's interviews with mitigation experts. Counsel described Robinson as "bright and articulate," noting he had no criminal convictions. Counsel urged the court to consider his "tender age" of 18 when the crime occurred and his present age of 20 and pleaded to "spare his life."

¶ 17     The court found that the lack of criminal background was a mitigating factor sufficient to not impose the death penalty, but this was "a cold, calculated, pre-meditated execution of an 18-year old girl" whom Robinson lured to his house to carry out his scheme. The court sentenced Robinson to a term of natural life for the murder conviction, a consecutive 30-year term for armed robbery, a concurrent 30-year term for aggravated vehicular hijacking, and a consecutive 5-year term for concealment of a homicide. We affirmed Robinson's sentence and the Illinois Supreme Court denied leave to appeal. *People v. Robinson*, 333 Ill. App. 3d 1211 (2002) (unpublished); *People v. Robinson*, 202 Ill. 2d 691 (2003).

¶ 18                         C. Postconviction Petitions

¶ 19     In January 2005, Robinson filed an initial postconviction petition alleging ineffective assistance of counsel. We affirmed the second-stage dismissal of the petition and the Illinois Supreme Court denied leave to appeal. *People v. Robinson*, 2015 IL App (1st) 123360-U; *People v. Robinson*, No. 119184 (Ill. Sept. 30, 2015).

¶ 20     In May 2015, Robinson sought leave to file a *pro se* successive postconviction petition raising multiple arguments, including a claim of actual innocence. Robinson asserted he was not involved in the crimes for which he had been convicted and Giles had been murdered by Leonard Tucker. In support, Robinson included his own affidavit as well as the affidavits of Yasmyn Johnson, Andre Mamon, Donald Shaw, and Tavares Hunt-Bey. Johnson is Robinson's ex-girlfriend and Mamon, Shaw, and Hunt-Bey were all serving prison sentences for unrelated murders. Robinson also referenced a 2006 report from the Special State's Attorney as "evidence of McDermott's history of coercing confessions out of suspects."

¶ 21     Robinson averred that on the day of Giles's murder, he contacted her to help transport gang weapons, but she never arrived at his home. He said he was with Johnson and others and then spent the night with a different woman. Robinson stated that he and Tucker were from different sects of the same gang and learned that Giles received money from her cousin in a rival gang. Tucker viewed Giles "bait" in an ongoing "war" between the rival gangs. Robinson claimed he withheld this information due to concerns for his safety and gang rules prohibiting cooperation with police.

¶ 22     In a November 10, 2014, affidavit, Johnson stated that she was with Robinson at her sister's apartment on December 28, 1997, where they spent one to two hours arguing over another girl. Johnson averred that she "saw the news and learned [Robinson] was in jail" two or three days later but did not say anything because she had "had completely written [him] off."

¶ 23     In his December 19, 2014, affidavit, Andre Mamon stated that shortly after Christmas 1997, he was with his father and witnessed a man named Lenny near a liquor store at 87th Street and South Colfax Avenue. After seeing a bright flash and hearing a loud gunshot, Mamon saw Lenny place an "A.K." gun in a car and leave with two others, disappearing through the viaduct. In August 2014, Mamon spoke with someone about a man named Ricky who had been imprisoned for a murder on South Chicago Avenue. Mamon didn't recognize Robinson as "Ricky," because

he went by a nickname. According to Mamon, he recalled the shooting incident he had witnessed years before, "but the name to go with the face he saw was Lenny." Later, at a prison dining table, he saw Robinson's name tag and asked about the murder by the viaduct. Robinson confirmed it, but Mamon said he was at the bus stop that night and did not see Robinson among those present.

¶ 24      In his affidavit dated March 5, 2015, Donald Shaw stated that between January 1995 and August 1999, he regularly spent time near 89th and Bennett in Chicago. He recalled an incident from December 28, 1997, when he saw three men, friends of Robinson, in a dark Ford Contour. Shaw recognized Tucker, whom he knew well, and saw another occupant with an AK-type assault rifle get out of the back seat of the car. That man ran down a gangway, returned empty-handed, and the three men drove off. Shaw claimed he could say "with absolute certainty that [Robinson] was not in that Ford Contour with Tucker." The affidavit further averred that, during the ensuing years, Shaw had not realized that this information "could and would have been helpful."

¶ 25      Tavares Hunt-Bey stated in his April 25, 2014, affidavit that on December 29, 1997, at a gas station on 87th Street and Exchange Avenue, he saw Leonard "Lenny" Tucker arrive in a red-maroon Chevy Corsica with two others. After greeting Hunt-Bey, Tucker mentioned he had killed the sister of a rival gang member the night before under a viaduct and warned Hunt-Bey to be "on point" because that rival gang might seek revenge. Tucker also said he borrowed the car to "tie up some loose ends," pumped gas into a can, and then left with the other two individuals. The following day, Hunt-Bey heard the news that Robinson had confessed to the killing and setting the body on fire. Hunt-Bey averred that he immediately knew Robinson was "taking the rap for Lenny" but the "code of silence" imposed by their gang prevented him from contacting the police because "snitching on a fellow member" was a "death violation." According to Hunt-Bey's affidavit, he recently heard Tucker had falsely testified against Robinson and, because Tucker was no longer a gang member, Hunt-Bey felt obligated to come forward.

¶ 26        The circuit court denied Robinson leave to file a successive postconviction petition, finding he failed to set forth a colorable claim of actual innocence. We affirmed, but the supreme court reversed and remanded. *People v. Robinson*, 2018 IL App (1st) 153547-U; *Robinson*, 2020 IL 123849. On remand, defense counsel filed a supplemental successive postconviction petition arguing Robinson's life sentence violated the Illinois Constitution's proportionate penalties clause. Robinson argued his life sentence should be reconsidered in light of *Miller v. Alabama*, 567 U.S. 460 (2012) because the circuit court did not sufficiently consider his youth and attendant circumstances when imposing sentence. In support, Robinson attached a 2019 report from Dr. James Garbarino, a developmental psychologist who interviewed Robinson to analyze how his life and circumstances affected his brain development in light of *Miller*. Garbarino's report concluded that, according to Robinson's own accounts of his upbringing and family life, his brain was not fully developed at age 18. However, he had since matured and could reenter society.

¶ 27        The State filed an answer to Robinson's petition, denying his allegations and agreeing to a third-stage evidentiary hearing.

¶ 28        D. Third-Stage Evidentiary Hearing

¶ 29        Mamon, Shaw, and Hunt-Bey all testified to the information contained in their affidavits at the third stage evidentiary hearing on September 26, 2023.

¶ 30        Mamon, who was serving a 52-year sentence for murder, admitted on cross-examination that he was nine years old in December 1997, did not know the lighting conditions under the viaduct, at what time the shooting occurred, how long the events lasted, or which side of the street the bus stop was on, and could not "even picture the block" or "say how the blocks are." Mamon noted inconsistencies between his affidavit and testimony regarding the number of people with Lenny. Mamon said he never discussed the night with his father, spoke to Robinson only once, and has written affidavits for other postconviction cases.

¶ 31        Shaw, who was serving a 22-year sentence for murder, admitted on cross-examination he was good friends with Robinson and his sister and had visited Robinson numerous times in pretrial custody. He did not believe he attended Robinson's trial, could not recall if he gave a statement for his sentencing, and never told Robinson what he witnessed, stating he "didn't think it had anything to do with him."

¶ 32        Hunt-Bey, who was serving a 26-year sentence for murder, testified that he told Robinson about his observations in 1998 but only wrote an affidavit in 2014. He said he probably arrived at the gas station around 9:30 a.m., stayed for about 30 minutes selling drugs, and could not remember if he reported being there between 2:00 and 3:00 p.m. in a 2022 interview, attributing his confusion to allergy pill use.

¶ 33        Richard Lombard, an investigator for the Cook County State's Attorney's Office, testified Hunt-Bey told him during a 2022 interview that three men drove into the gas station around 2:00 or 3:00 p.m. Lombard also interviewed Mamon in 2022, who stated he saw "two or three" men inside the car Tucker drove, and later saw two men outside the car. Mamon told Lombard he heard "two or three" gunshots but did not see the gun. At one point, Mamon told Lombard the shooting happened at night, but later said it happened sometime before noon.

¶ 34        The State entered into evidence the Illinois Torture Inquiry and Relief Commission's 2016 report regarding Robinson's 2011 claim that McDermott coerced his confession. The report indicates that the investigation found insufficient evidence to refer the matter to the circuit court and noted that Robinson's allegation had evolved from implicating Ganaway as the murderer to identifying Tucker as the perpetrator.

¶ 35        In January 2024, the court denied Robinson's postconviction petition, finding that he failed to meet his burden. The court found Mamon was not credible, expressing disbelief that "a 9 year old *** would be so cognizant of what was going on to make a mental note of the parties involved

such that he could say 17 years later that [Robinson] was not present at that shooting." The court also noted it had the opportunity to observe Mamon's demeanor while testifying and "[h]e did not appear to be telling the truth."

¶ 36 As to Shaw, the court found that while Shaw might implicate Tucker in weapon disposal, he did not witness the shooting or exonerate Robinson. As for Hunt-Bey, the court found his affidavit was not of such a conclusive character that it would probably change the outcome on retrial because Hunt-Bey did not see the murder or burning of the body and his testimony about Tucker's statement was inadmissible hearsay.

¶ 37 After reviewing all evidence, the court found that testimony from Mamon, Shaw, and Hunt-Bey did not prove Robinson's actual innocence by a preponderance of the evidence, given his confession and its corroboration by three State witnesses. The court determined that Robinson's claim of a coerced confession was without merit, as Robinson only raised it years after arrest and conviction, and not before trial. The court noted his detailed and incriminating 70-page custodial statement was made in response to open-ended questions. Citing to *People v. Moore*, 2023 IL 126461, the court also determined that Robinson did not establish cause and prejudice for pursuing his sentencing claim under the proportionate penalties clause. Robinson now appeals.

¶ 38                                          II. ANALYSIS

¶ 39 On appeal, Robinson argues the court erred in denying his successive postconviction petition, asserting he presented new and compelling evidence implicating another person in the killing and burning of Giles, which would probably change the result on retrial. Additionally, Robinson argues he met the cause and prejudice test for filing a successive petition by presenting new, previously unavailable evidence indicating that, at the age of 18 when the offense occurred, his brain was not fully mature and still undergoing development. We are unconvinced.

¶ 40 At a third-stage evidentiary hearing under the Post-Conviction Hearing Act (Act) (725

ILCS 5/122-1 (West 2018)), the petitioner must show by a preponderance of evidence that a constitutional right was substantially violated during his trial proceedings. *People v. McCoy*, 2026 IL 131565, ¶ 50. "At the third stage, unlike the first and second stages, the allegations are not taken as true, and instead, 'the trial court acts as a factfinder, making credibility determinations and weighing the evidence.' " *Id.* (quoting *People v. Reed*, 2020 IL 124940, ¶ 51). Because the circuit court is in the best position to observe the witnesses and make credibility determinations, we will not overturn its factual findings and credibility determinations unless they are manifestly erroneous. *Id.* However, where the issue involves matters of law and there is no evidentiary hearing, our review is *de novo*. *People v. Mitchell*, 2012 IL App (1st) 100907, ¶ 39.

¶ 41                                    A. Actual Innocence Claim

¶ 42        To succeed on an actual innocence claim, Robinson must present new, material, noncumulative evidence that is so conclusive it would probably change the result on retrial. *McCoy*, 2026 IL 131565, ¶ 54. "New means the evidence was discovered after trial and could not have been discovered earlier through the exercise of due diligence." *People v. Coleman*, 2013 IL 113307, ¶ 96. Material means the evidence is relevant and probative of the petitioner's innocence. *McCoy*, 2026 IL 131565, ¶ 54. Noncumulative means the evidence adds to what the jury heard. *Id.* Conclusive means the evidence, when considered along with the trial evidence, would probably lead to a different result. *Id.* The conclusive character of the new evidence is the "most important element of an actual innocence claim" and we may affirm the denial of the actual innocence claim based on the finding that the defendant failed to establish the conclusive character element. *Id.* (quoting *Robinson*, 2020 IL 123849, ¶ 47). The standard for actual innocence claims is "extraordinarily difficult to meet." *Coleman*, 2013 IL 113307, ¶ 94.

¶ 43        Robinson challenges the court's decision that Mamon, Shaw, and Hunt-Bey's new testimony lacked credibility, claiming it was sufficient to probably change the result on retrial.

However, after reviewing the record and giving deference to the circuit court's findings on facts and credibility from the third-stage hearing, we conclude that the result would not change and that there was no manifest error.

¶ 44     In reaching its decision, the court made fact-finding and credibility determinations, such as where it found that Mamon was unreliable due to his age and demeanor, and determined that the new witnesses' statements did not prove actual innocence by a preponderance of the evidence. In contrast, the court found that McClendon and Muhammad were "close" to Robinson, "in [his] corner," and had no reason to "fabricate evidence" against him; yet they still testified Robinson admitted his involvement in the murder. These findings are supported by the record.

¶ 45     McClendon, who was dating Robinson at the time, drove him and the other two men to Robinson's grandmother's house on the night of the murder, and at one point Robinson told her he had shot Giles. The next day, she overheard him discussing the burning of Giles's body with the other men. Later, when she was alone with Robinson, he provided additional details about what he had done. She identified the rifle she had seen previously at the homes of Northcutt and Robinson in the weeks before the shooting. Muhammad, a friend of Robinson's sister, drove him to a gas station and then to the alley the day after the shooting. When Robinson returned to the car, Muhammad smelled gasoline, and Robinson told her that he burned Giles's body. Both women initially expressed disbelief at Robinson's statements but ultimately came forward and recounted his admissions at trial, providing details that mirrored Robinson's own admissions.

¶ 46     On the other hand, Mamon and Hunt-Bey were not close to Tucker and would readily blame him for the murder. It is unlikely that Mamon, Shaw, and Hunt-Bey all independently witnessed the events of December 1997, met Robinson during their own murder sentences, and accurately recalled those events years later to clear his name. Their accounts differed from Robinson's confession and gave the court ample reason to question their credibility. See *Reed*,

2020 IL 124940, ¶ 54 ("We cannot say it was unreasonable for the court to question the truthfulness of [the witness], where he came forward only after being imprisoned and discussing the case with defendant" and the court "had the benefit of observing [his] demeanor during examination and assessing his testimony against the other evidence.").

¶ 47 Shaw, who claimed to be good friends with Robinson, could not say with certainty whether he attended Robinson's trial or gave a statement at sentencing, and he never told anyone what he purportedly saw until his 2015 affidavit. Hunt-Bey also did not come forward for many years, and when confronted with the discrepancies in his testimony, he blamed it on allergy pills. Mamon, who was nine years old at the time, asserted many years later that he could definitively state Robinson, whom he had never met, was not present at the scene. Yet he could not recall the lighting conditions, time of day, duration of the encounter, or layout of the area near the murder scene, and he never told anyone that he saw the aftermath of a shooting.

¶ 48 The court found Muhammad and McClendon's consistent and timely testimony more credible than the late, inconsistent accounts of three incarcerated witnesses who met Robinson in prison. Acting as factfinder, the circuit court properly evaluated the evidence and made sound credibility determinations. As Robinson's evidence is not of such a conclusive character that is probable to change the outcome on retrial, his actual innocence claim fails, and the court correctly denied his successive postconviction petition after the third-stage evidentiary hearing.

¶ 49 B. Proportionate Penalties Claim

¶ 50 Robinson also contends the circuit court erred when it found he failed to show cause and prejudice to raise a proportionate penalties claim. We disagree.

¶ 51 To satisfy section 122-1 of the Act, the petitioner must demonstrate both cause for his failure to raise the claim in the initial petition and prejudice from that failure. A petitioner shows cause by "identifying an objective factor that impeded his or her ability to raise a specific claim

during his or her initial post-conviction proceedings." 725 ILCS 5/122-1(f) (West 2018). A petitioner shows prejudice by "demonstrating that the claim not raised during his or her initial post-conviction proceedings so infected the trial that the resulting conviction or sentence violated due process." *Id.*

¶ 52   The proportionate penalties clause of the Illinois Constitution provides that "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. 1, § 11. A sentence violates the proportionate penalties clause if "the punishment for the offense is cruel, degrading, or so wholly disproportionate to the offense as to shock the moral sense of the community." *People v. Leon Miller*, 202 Ill. 2d 328, 338 (2002). The proportionate penalties clause provides broader protections than those provided in the eighth amendment. *People v. Gipson*, 2015 IL App (1st) 122451, ¶¶ 69-78; *People v. Clemons*, 2012 IL 107821, ¶ 36.

¶ 53   At the time Robinson filed his supplemental successive petition in 2021, he relied on new, evolving case law interpreting the proportionate penalties clause as applied to emerging adults to explain why he had not raised these claims in earlier postconviction proceedings. See *e.g.*, *People v. Thompson*, 2015 IL 118151; *People v. Harris*, 2018 IL 121932; *People v. House*, 2021 IL 125124. However, in the ensuing years, this area of law has narrowed significantly. See *People v. Horshaw*, 2024 IL App (1st) 182047-B, ¶¶ 47-55 (tracing the history of proportionate penalties clause jurisprudence as it relates to young adults serving life sentences).

¶ 54   In summary: *Thompson* and *Harris* initially "opened the door" for young-adult offenders to demonstrate, through an adequate factual record, that their own "specific characteristics were so like those of a juvenile that imposition of a life sentence absent the safeguards established in *Miller* was cruel, degrading, or so wholly disproportionate to the offense that it shocks the moral sense of the community." *People v. Daniels*, 2020 IL App (1st) 171738, ¶ 25; see *Thompson*, 2015

IL 118151; *Harris*, 2018 IL 121932. However, in *People v. Moore*, 2023 IL 126461, our supreme court pointed out that "the essential legal tools" have always been available for petitioners to use during initial postconviction proceedings. *Id.* ¶ 42. Because "*Miller* did not change the law applicable to young adults, it does not provide cause for the proportionate penalties challenges advanced" in a successive postconviction petition. *Id.*

¶ 55    In applying *Moore*, we have repeatedly observed that "*Thompson* and *Harris* opened the door only wide enough to accommodate claims involving mandatory life sentences that were raised in *initial* postconviction petitions." (Emphasis added.) *Horshaw*, 2024 IL App (1st) 182047-B, ¶ 62; see *e.g. People v. Brady*, 2026 IL App (1st) 232206-U, ¶ 23; *People v. Brewer*, 2025 IL App (1st) 240088, ¶¶ 29-30, *People v. Minniefield*, 2025 IL App (1st) 240463-U, ¶ 54; *People v. Handy*, 2025 IL App (1st) 231568-U, ¶ 58; *People v. Davis*, 2025 IL App (1st) 231499-U, ¶¶ 19, 24. Robinson's proportionate penalties claim first came in a successive postconviction petition and, thus, came too late.

¶ 56    Moreover, Robinson did not need *Miller* or any proportionate penalty precedents related to *Miller* to bring the current claim, for it is "nothing more than an extension of proportionate penalties claims that have existed all along." *Horshaw*, 2024 IL App (1st) 182047-B, ¶ 62 (citing *People v. Dorsey*, 2021 IL 123010, ¶ 74; *People v. Clark*, 2023 IL 127273, ¶¶ 92-93; *People v. Hilliard*, 2023 IL 128186, ¶ 28); see also *e.g. People v. Ornelas*, 2025 IL App (1st) 220625-U, ¶ 62; *People v. McGee*, 2025 IL App (1st) 231591-U, ¶ 32; *People v. Scaggs*, 2025 IL App (1st) 240953-U, ¶ 49; *Handy*, 2025 IL App (1st) 231568-U, ¶ 58. As such, it does not satisfy the cause prong of the cause and prejudice test. *Horshaw*, 2024 IL App (1st) 182047-B, ¶ 62.

¶ 57    Robinson seeks to redirect attention from *Miller*, contending that the cause prong is satisfied based on newly presented evidence in Dr. Garbarino's report and the court's alleged failure to consider Robinson's youth as a mitigating factor. This contention lacks support. The

court was fully apprised of Robinson's age and absence of prior criminal history at the time of the offense, as these details were included in Robinson's PSI, raised by the State, and addressed by defense counsel during mitigation. There is no requirement for the court to expressly reference every mitigating factor considered when imposing a sentence of natural life rather than death.

¶ 58     Additionally, Dr. Garbarino's report does not establish cause for Robinson's omission of the claim in an earlier petition. Dr. Garbarino's report is based on Robinson's answers to a questionnaire, so it is not as though newly discovered evidence has surfaced over which Robinson had no control. See *People v. French,* 2022 IL App (1st) 220122, ¶ 33. Furthermore, consistent with *Clark* and *Moore*, this court has held repeatedly that the prior unavailability of neuroscientific research regarding young adult brain development, as provided by Dr. Garbarino, does not constitute sufficient cause to raise a proportionate penalties claim in a successive petition. See, *e.g.*, *People v. Lowe,* 2026 IL App (1st) 241544-U, ¶ 49; *People v. Boclair,* 2025 IL App (1st) 240911-U, ¶¶ 43-44; *Scaggs,* 2025 IL App (1st) 240953-U, ¶¶ 46, 49-51; *People v. Robinson,* 2025 IL App (1st) 231419-U, ¶¶ 59, 62-63; *People v. Searles,* 2024 IL App (1st) 210043-U, ¶¶ 13-17. ¶¶ 32-33; *People v. Jones*, 2025 IL App (5th) 230511-U, ¶ 41. Because Robinson cannot establish cause for failing to raise a proportionate penalties claim earlier, the court did not err in denying his supplemental successive petition.

¶ 59                                   III. CONCLUSION

¶ 60     For these reasons, we affirm the circuit court's denial of Robinson's successive postconviction petition.

¶ 61     Affirmed.