2026 IL App (1st) 241544-U

FIRST DIVISION
March 30, 2026

No. 1-24-1544

NOTICE: This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | |
| | ) | Appeal from the |
| Respondent-Appellee, | ) | Circuit Court of |
| | ) | Cook County. |
| v. | ) | |
| | ) | No. 98 CR 19106 (02) |
| DONZELL LOWE, | ) | |
| | ) | Honorable |
| Petitioner-Appellant. | ) | Timothy Joseph Joyce, |
| | ) | Judge Presiding. |
| | ) | |

PRESIDING JUSTICE FITZGERALD SMITH delivered the judgment of the court. Justices Howse and Cobbs concurred in the judgment.

**O R D E R**

¶ 1    *Held*: We affirm the circuit court's second-stage dismissal of the successive postconviction petition, where postconviction counsel did not provide unreasonable assistance by failing to argue an as-applied proportionate penalties claim.

¶ 2    The petitioner, Donzell Lowe, appeals from the second-stage dismissal of his successive petition filed pursuant to the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2020)). On appeal, he solely argues that he was denied his right to the reasonable assistance of

postconviction counsel. For the following reasons, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4     Because the procedural history of this case and the evidence adduced at the petitioner's trial are fully articulated in our decision affirming the petitioner's conviction on direct appeal (*People v. Lowe*, No. 1-00-3878 (2003) (unpublished order pursuant to Illinois Supreme Court Ruler 23)) and our order affirming the dismissal of his first *pro se* postconviction petition (*People v. Lowe*, 2011 IL App (1st) 100309-U)), we set forth only those facts relevant to the resolution of the issues raised here.

¶ 5     In July 1998, the 18-year-old petitioner was charged with, *inter alia*, the first-degree murder of Gerchaton Young and attempted first-degree murder of Reggie Rupert. In 2000, the petitioner proceeded with a bench trial. Summarized, the evidence adduced at trial established that on June 21, 1998, the petitioner, who was a member of the Blackstone Ranger gang, participated in a drive-by shooting at 5846 South Hermitage Avenue, which resulted in Young's death and Rupert's injuries. At the time of the shooting, Young was sitting inside her vehicle with her sister, talking to Rupert, who was standing outside. Rupert, who was a member of the Gangster Disciples gang, had recently been released on bond after having been charged with the murder of the petitioner's brother. While Rupert was talking to Young, a burgundy vehicle with four individuals, including the petitioner and a codefendant, Cion Rice, turned the corner, and both men shot in Rupert's direction striking him and killing Young. In his statement to the police, the petitioner admitted to being present for the shooting, but stated that it was codefendant Rice who carried out the shooting in retaliation for a prior shooting earlier that day carried out by the Gangster Disciples. At trial, the petitioner also presented alibi testimony from his grandmother and a friend, averring that at the time of the shooting he was at home playing video games and had been using crutches

because he had previously been shot.

¶ 6    Based on the aforementioned evidence, the trial judge found the petitioner guilty of the first-degree murder of Young and the attempted first-degree murder of Rupert.

¶ 7    At the subsequent sentencing hearing, the court was presented with a presentence investigation report (PSI). According to the PSI, the petitioner was 18 years old at the time of the offense and had attended school until the eleventh grade. The petitioner was not married but had a three-year-old child, who lived in Milwaukee. The petitioner described his own childhood as "fair" and indicated he did not experience any abuse or neglect. The petitioner's father "split" when he was seven years old and the petitioner was raised by his mother and grandmother. The petitioner reported that his health was "poor" because of diabetes and a gunshot wound to his right leg. He also stated that in 1995 he was hospitalized for depression "somewhere on North Lake Shore Drive." The petitioner stated that he did not abuse drugs or alcohol. He admitted to being a member of the Blackstone Rangers between 1992 and 1995 but claimed he left the gang after his brother died from gunshot wounds.

¶ 8    According to the PSI, the petitioner's criminal history included two juvenile delinquency findings and one adult felony conviction. Specifically, as a juvenile, in 1992, the 12-year-old petitioner pleaded guilty to attempted first-degree murder and was placed on probation. Two years later, in 1994, the 14-year-old petitioner pleaded guilty to unlawful use of a weapon (UUW) and was sentenced to 30 days in the Juvenile Temporary Detention Center. In September 1997, the petitioner again pleaded guilty to UUW and was sentenced to two years of felony probation as an adult, which he was still serving at the time he committed the instant offense.

¶ 9    At the sentencing hearing, in aggravation, the State presented a victim impact statement from Young's sister and testimony by two police officers regarding the petitioner's adult criminal

history. That testimony additionally revealed that, at the time of his arrest in the instant case, the petitioner was out on bond in a separate case in which had had been charged with the February 1998 attempted first-degree murder of Kamau Mason, and which was still pending in Bridgeview at the time of his sentencing hearing.

¶ 10 Based on the petitioner's criminal history, gang involvement, and the facts of the instant crime, which had resulted in the death of an innocent victim, the State argued that the petitioner was not someone who deserved a "break," and urged the court to impose a substantial sentence.

¶ 11 In response, in mitigation, defense counsel presented the testimony of the petitioner's mother, Veronica Jones, who described the petitioner's struggles with childhood diabetes and complications stemming from an October 1998 gunshot wound to his leg, which required numerous surgeries and his walking with the use of crutches. Jones also testified that prior to the sentencing hearing Mason told her that the petitioner was not the man who shot him in February 1998.

¶ 12 Based on this evidence, defense counsel argued that the petitioner was a "young man 20 years old," who had only one prior adult felony conviction, and suffered from "various illnesses," including diabetes, which "continue[d] to plague him." Counsel urged the court to take into account those "good things" about the petitioner it had heard from the "people who love him," and impose a sentence that would not "bury him" but would allow him to return to his family "while he [wa]s still a relatively young man." As counsel argued:

"You have the power to say I'm going to give you a sentence where you will never see daylight again. I am asking you that you don't. I am asking you to consider the act that at the tender age of 20 he is still subject to rehabilitation. That he could be a fruitful and contributing person to society. That he is educated enough, that he is understanding

4

enough, that he could eventually go back to a loving family."

¶ 13    After considering the parties' arguments, the PSI, and the facts of the instant case, on June 21, 1998,[1] the trial judge sentenced the petitioner to 50 years' imprisonment on the first-degree murder conviction and 10 years' imprisonment on the attempted first-degree murder conviction to be served concurrently.[2]

¶ 14    On direct appeal, the petitioner argued that his trial counsel was ineffective for failing to secure the live testimony of a witness or make a timely request that the circuit court consider that witness's testimony in codefendant Rice's trial as substantive evidence. On March 31, 2003, we rejected the petitioner's arguments and affirmed his convictions and sentence. See *People v. Lowe*, No. 1-00-3787 (2003) (unpublished order pursuant to Illinois Supreme Court Ruler 23).

¶ 15    On August 12, 2003, the petitioner filed a *pro se* postconviction petition alleging that he was denied a fair trial and effective assistance of counsel. After the circuit court docketed the petition for further proceedings, on June 12, 2008, privately retained counsel supplemented the petition to include a claim of actual innocence. The petition was ultimately dismissed after a third-stage evidentiary hearing. We affirmed that dismissal on November 23, 2011. See *People v. Lowe*, 2011 IL App (1st) 100309-U.

¶ 16    On December 2, 2022, by way of a new privately retained counsel, the petitioner sought

---

[1] This was two days after truth-in-sentencing went into effect.

[2] We note that in his opening brief, the petitioner incorrectly asserts that he is serving a 60-year sentence. While it is true that in imposing the sentence, the judge initially stated that the 50- and 10-year sentences were to be served consecutively, after a prompt from the State, the judge immediately corrected himself and clarified that the sentences were to be served concurrently. Both the *mittimus* and our previous orders affirming the petitioner's conviction and sentence and the dismissal of his original postconviction petition confirm that the sentences imposed were to be served concurrently for an aggregate sentence of 50 years' imprisonment. See *People v. Lowe,* 1-00-3787, p. 1 (stating that the petitioner "was sentenced to 50 years and 10 years in prison, to be served concurrently"); *People v. Lowe,* 2011 IL App (1st) 100309-U, ¶ 4 ("The court ultimately sentenced defendant to concurrent, respective terms of 50 and 10 years' imprisonment on his first degree murder and attempted first degree murder convictions"). The Illinois Department of Corrections' (IDOC) website similarly confirms that the petitioner's sentence is 50 years. https://idoc.illinois.gov/offender/inmatesearch.html; *People v. Gipson,* 2015 IL App (1st) 122451, ¶ 66 (we may take judicial notice of information on the IDOC website).

5

leave to file the instant successive postconviction petition, alleging that he was entitled to a new sentencing hearing because he was "sentenced without consideration" of any of the factors articulated under *Miller v. Alabama*, 567 U.S. 460 (2012) and its progeny. The petitioner argued that he established cause for failing to raise this issue earlier because the law concerning lengthy sentences for juveniles changed after he filed his initial postconviction petition in 2003. He also argued that there was a reasonable probability that the outcome of his sentencing hearing would have been different had the sentencing court correctly understood and applied the eighth amendment because the new constitutional rule articulated in *Miller* applied retroactively and prohibited the imposition of *de facto* life sentences, such as his own, on juvenile offenders. The petitioner acknowledged that at the time of his offense, he was 18 years old and therefore "not technically a juvenile," but nevertheless asserted that the eighth amendment protections afforded to juveniles under *Miller* should be extended to him because he was "functioning at a mental age of less than 18."

¶ 17    In support, the petitioner attached a 34-page report prepared on May 29, 2020, by expert developmental psychologist Dr. James Garbarino. In that report, Dr. Garbarino explained that he was not "offering any clinical diagnoses" of the petitioner but rather providing an analysis of the petitioner's developmental "pathway from infancy to adolescence" in the context of the decision in *Miller* in order to explain why the protections afforded to juveniles under *Miller* should also be extended to the petitioner. According to Dr. Garbarino's report, new neuroscientific research has demonstrated that the development of brain structure and function does not stop at 18 years of age but rather continues well throughout an individual's early twenties and impacts both a young adult's thought process and future for rehabilitation. Consequently, the same level of "immaturity of thinking and feeling" that plagues juveniles, continues to plague young adults over the age of

18 and delays their executive functioning, affective regulation, and decision-making processes.

¶ 18    Dr. Garbarino explained that this is particularly true with individuals exposed to chronic childhood trauma, such as the petitioner. In this respect, Dr. Garbarino noted that the petitioner scored a 10 out of 10 on the Adverse Childhood Experiences (ACE) test, a risk assessment tool endorsed by the Centers for Disease and Control (CDC) that predicts future health and functioning based upon an individual's traumatic childhood experiences (including, physical, sexual, and psychological maltreatment, poverty, domestic violence, household substance abuse, parental separation or divorce, depression or suicide in family members, and family incarceration). According to Dr. Garbarino, the petitioner's score put him in the category of children who were worse off than 99.9% of the general population.

¶ 19    This score reflected, *inter alia*, some of the following childhood experiences. The petitioner's father left when the petitioner was only six years old. The petitioner's mother struggled, "got a new boyfriend and had a baby." At that time, the petitioner "got beat for the smallest acts almost every day," and felt lost and angry at everyone who had "abandoned" him. When asked what word came to mind in response to "mother," the petitioner replied "liar," in contrast to the word "loser" that he offered when asked to respond to the word "father." The petitioner stated that the most important thing a man can be is a "good father."

¶ 20    The petitioner was diagnosed with diabetes at a young age, after which he was repeatedly bullied, teased, treated differently, and "cussed at" at home. The petitioner struggled in school and was involved in fights "too many times to count." The petitioner's uncles and cousins used drugs and introduced the petitioner to "life on the streets."

¶ 21    The petitioner spent his entire life in a neighborhood plagued with violence. He first witnessed someone getting shot when he was a small child. By the time he was 11 or 12 years old,

the petitioner had been shot at on numerous occasions and believed that carrying a gun in the neighborhood for protection was normal. By virtue of geography, he joined the Blackstone Rangers because they made him feel "needed." Drug dealing and shooting became "the norm" for him. When he was in sixth grade, the petitioner shot another teenager and "spent time in Juvie" after which he came home feeling like he was "The Man." By the time he was 15 years old, the petitioner's brother and two of his best friends were shot and killed. The petitioner could not cope and told his doctor that he was going to kill himself, after which he was admitted to a Lake Shore mental health institution for a few weeks. The petitioner was himself shot in 1997, after which he underwent numerous surgeries due to complications arising from his diabetes.

¶ 22    Based on this social history and the new neuroscientific research, Dr. Garbarino opined that the petitioner was the "embodiment of the developmental issues" with which the *Miller* decision was concerned. Specifically, despite being 18 years old, the petitioner "demonstrated immaturity of thought and emotional control, impetuous and impulsive action, and failure to appreciate the full consequences of his criminal behavior." As Dr. Garbarino explained, the petitioner "came out of a family and home environment that was toxic and developmentally damaging because of abuse" and "lived in community settings that compensated for the traumatic features of his home life." Moreover, because that community setting was "an urban war zone," the petitioner necessarily developed a "war zone mentality," reflected in his extreme sensitivity or hyper vigilance to any kinds of threats, and a high probability of responding to perceived threats with aggression, including preemptive assaults (*i.e.*, "get them before they get me.").

¶ 23    Nonetheless, Dr. Garbarino opined that the petitioner was not "irreparably corrupt" but rather an "untreated, traumatized child inhabiting and controlling the body of a teenager," for whom there remained a possibility of rehabilitation. In this respect, Dr. Garbarino explained that

to assess whether the petitioner was a good candidate for *Miller* resentencing he used a clinical framework developed by clinical psychologist Carol Holden which requires the consideration of the following factors: (1) poor disciplinary history, with little evidence of improvement; (2) ongoing criminal behavior; (3) violence or predatory behavior; (4) continuing gang involvement; (5) failure to benefit from educational programming; (6) poor work record; (7) failure to benefit from psych/self-help programing; (8) lack of insight and/or treatment amenability; (9) criminal attitudes; (10) lack of remorse; (11) callous-unemotional traits; (12) current antisocial personality disorder/psychopathy; (13) assessed high risk for recidivism; and (14) ongoing substance use or mental illness. According to Dr. Garbarino, an examination of the petitioner's life in prison over the last 22 years established that he did not meet these criteria.

¶ 24    Instead, the petitioner demonstrated "a generally good disciplinary record" and "no pattern of criminal behavior." Specifically, although the petitioner participated in an assault "to prove himself" when he was initially brought to prison in 2002, after a year in segregation, at age 23 he told himself that he needed to change and do better. Since then, the petitioner has had no violent infractions. Instead, he has "benefited from educational programs and engaged in efforts to understand and process the massive adversity he experienced growing up." Specifically, the petitioner now acknowledges and appreciates the destructiveness of his past behavior and expresses remorse for "the loss of life." In addition, despite suffering a heart attack in jail at the age of 35, which required bypass surgery, the petitioner has continued to work on obtaining his general education degree (GED), participated in math and financial skills classes, and worked in various jobs within the penitentiary, including in health care, kitchen work, and various maintenance roles. Under this record, Dr. Garbarino concluded that "there is hope" for the petitioner and he is "not a lost cause."

¶ 25    After reviewing Dr. Garbarino's report, on April 3, 2023, the circuit court granted the petitioner leave to file his successive postconviction petition and advanced the petition to the second stage of postconviction proceedings.

¶ 26    On August 3, 2023, postconviction counsel informed the court that he would file a Rule 651(c) certificate that day, and on September 26, 2023, stated that he had "recently" filed that certificate. On November 1, 2023, however, counsel indicated that he would "be back in the building on [November] 14th and [would] get that 651(c) filed and we'll get rolling on this." Subsequently, on November 14, 2023, counsel informed the court that even though the case had been continued so that he could file his 651(c) certificate, he believed that he had "actually filed th[e certificate] online like a month or two ago." Counsel stated that the certificate should be online but that if the court could not "pull it up," he "brought a hard copy." The court instructed counsel to give the "hard copy" to the State and counsel said that he would.[3]

¶ 27    On February 5, 2024, the State filed a motion to dismiss the postconviction petition. Therein, the State conceded that the petitioner could establish cause for failing to raise his eighth amendment sentencing challenge earlier because the decision in *Miller* had not been decided until after he had filed his original postconviction petition. The State, nonetheless, asserted that the petitioner had failed to establish prejudice, or in the alternative, that his eighth amendment challenge was meritless warranting dismissal, because he was 18 years old at the time of the offense, and therefore not entitled to any protections under *Miller*. The State explained that our supreme court has repeatedly held that the eighth amendment protections created by *Miller* and its progeny apply only to juveniles and not to young adults, 18 years or older, such as the petitioner

---

[3] The record before us does not contain a copy of a Rule 651(c) certificate. What is more, nothing in the circuit court's pronouncements, case summary, or half-sheets supports postconviction counsel's assertion that such a certificate was ever filed.

in the instant case. See *People v. Moore*, 2023 IL 126461; *People v. Harris*, 2018 IL 121932. The State further argued that because all the decisions cited to by the petitioner involved eighth amendment sentencing challenges by juvenile offenders, the petitioner had failed to provide the court with any authority "applicable to his situation."

¶ 28    On May 8, 2024, postconviction counsel requested additional time to complete his response to the State's motion to dismiss but ultimately never filed one.

¶ 29    On July 18, 2024, the circuit court held a hearing on the State's motion to dismiss. At that hearing, the State chose to rest on its motion, noting that the issue was a "fairly straightforward eight amendment" sentencing challenge that failed because the petitioner was 18 years old at the time of the offense and therefore not a juvenile. In response, postconviction counsel reiterated that according to Dr. Garbarino's report, even though the petitioner was 18 years old at the time of his offense, "his mental age was below 18" such that *Miller* and its progeny should apply and the petitioner should be afforded a resentencing hearing.

¶ 30    After hearing the parties' arguments, the court granted the State's motion to dismiss the petition. In doing so, the court construed the successive petition as challenging the petitioner's 50-year *de facto* life sentence under both the eight amendment and the Illinois proportionate penalties clause. The court then found that pursuant to our supreme court's recent decision on *People v. Moore*, 2023 IL 126461, the petitioner could not succeed on either claim. The petitioner now appeals.

¶ 31                                   II. ANALYSIS

¶ 32    On appeal, the petitioner solely asserts that he was denied his right to reasonable assistance of postconviction counsel because counsel failed to properly raise a proportionate penalties' sentencing challenge in his successive petition. The petitioner, therefore, seeks remand for further

11

second-stage proceedings with the appointment of new counsel. For the following reasons, we disagree and find that remand for appointment of new counsel is unwarranted.

¶ 33    The Act (725 ILCS 5/122-1 *et seq.* (West 2020)) provides a mechanism by which criminal defendants may address substantial violations of their constitutional rights that occurred either at trial or at sentencing. See *People v. Cotto*, 2016 IL 119006, ¶ 26; *People v. English*, 2013 IL 112890, ¶ 22. Because the Act is not a substitute for an appeal, but rather, a collateral attack on a final judgment, issues that were not presented in an original postconviction petition are forfeited and issues that were previously raised and addressed on direct appeal are barred by the doctrine of *res judicata. People v. Clark*, 2023 IL 127273, ¶ 38 (citing 725 ILCS 5/122-3 (West 2014)); see also *People v. Sanders*, 2016 IL 118123, ¶ 24.

¶ 34    Consistent with these principles, the Act contemplates the filing of only one petition without leave of court and codifies the cause-and-prejudice test as the prerequisite to obtaining such relief. 725 ILCS 5/122-1(f) (West 2020). *People v. Lusby*, 2020 IL 124046, ¶ 27; *People v. Edwards*, 2012 IL 111711, ¶ 23.  To obtain leave, the petitioner must establish cause by identifying an objective factor that impeded his ability to raise a specific claim during his initial postconviction proceedings and prejudice by demonstrating that the claim not raised earlier so infected the trial that the resulting conviction or sentence violated due process. *Id.*

¶ 35    If, as here, the circuit court grants leave to file a successive petition, the petition is docketed for second-stage proceedings, where the petitioner must make a substantial showing of a constitutional violation. *People v. Harper*, 2013 IL App (1st) 102181, ¶ 33; *Cotto*, 2016 IL 119006, ¶ 27. At the second stage, counsel is appointed for indigent prisoners, and the State may seek dismissal of the petition on any ground, including procedural default. See *People v. Bailey*, 2017 IL 121450, ¶ 26. This permits the State to, once again, argue that dismissal is proper because the

petitioner failed "to prove cause and prejudice for not having raised the claims in the initial postconviction petition." *Id*. Our review of the circuit court's second-stage dismissal of a petition is *de novo*. *People v. Johnson*, 2024 IL App (1st) 220419, ¶ 65.

¶ 36    There is no constitutional right to the assistance of counsel in postconviction proceedings. *People v. Williams*, 2025 IL 129718, ¶ 43; *People v. Urzua*, 2023 IL 127789, ¶ 51; *People v. Johnson*, 2018 IL 122227, ¶ 16. Rather, the right to counsel derives solely from the Act. *Id*. While the Act does not provide for a precise level of assistance, our supreme court has repeatedly held that postconviction counsel must provide "reasonable assistance." *Id*. This standard is "significantly lower than the one mandated at trial by our state and federal constitutions." *People v. Custer*, 2019 IL 123339, ¶ 30; see also *People v. Frey*, 2024 IL 128644, ¶ 23. This is so, because "[c]ounsel is appointed not to protect postconviction petitioners from the prosecutorial forces of the State but to shape their complaints into the proper legal form and to present those complaints to the court." *Addison*, 2023 IL 127119, ¶ 19.

¶ 37    The reasonable assistance standard applies regardless of "whether the attorney is appointed or retained and whether the proceedings are at the first, second, or third stage." *Urzua*, 2023 IL 127789, ¶ 51; *Williams*, 2025 IL 129718, ¶ 43; *Cotto*, 2016 IL 119006, ¶ 42. While it is axiomatic that when postconviction counsel files a compliant Rule 651(c) certificate,[4] a rebuttable presumption is created that counsel provided reasonable assistance (*People v. Smith*, 2022 IL 126940, ¶ 29), Rule 651(c) applies only when the petition that initiates the proceeding is filed *pro se*. See *Johnson*, 2018 IL 122227, ¶ 18 (Rule 651(c) "applies only to those defendants who file their initial petition *pro se* and who are [represented by] counsel at the second stage"); *Cotto*, 2016

---

[4] Pursuant to Illinois Supreme Court Rule 651(c) postconviction counsel must attest that he or she has consulted with the petitioner, examined the record of the trial proceedings, and made amendments to the petition necessary to advance the petitioner's claims. Ill. S. Ct. R. 651(c) (eff. July 1, 2017).

IL 119006, ¶ 41; *People v. Perkins*, 229 Ill. 2d 34, 44 (2007) (the purpose of Rule 651(c) is to ensure that counsel shapes the petitioner's *pro se* claims into proper legal form and presents those claims to the court). Where, as here, privately retained counsel drafts the petition that initiates the proceedings, obviating the application of Rule 651(c), our courts have applied a "*Strickland*-like analysis" in evaluating the "reasonableness" of postconviction counsel's performance. See *People v. Zareski*, 2017 IL App (1st) 150836, ¶¶ 58-61; *People v. Perez*, 2023 IL App (4th) 220280, ¶¶ 41-54. Under this analysis, the petitioner must show both some level of deficient performance by postconviction counsel and prejudice stemming from that performance, *i.e.*, that there "is a reasonable probability that, but for counsel's errors, the result of the [postconviction] proceeding would have been different." *People v. Ayala*, 2022 IL App (1st) 192484, ¶ 162. The purpose of this standard is to "prevent pointless remands to trial courts for repeated evaluation of claims that have no chance of success." *Zareski*, 2017 IL App (1st) 150836, ¶ 59.

¶ 38    Whether counsel has provided a reasonable level of assistance necessarily depends on the unique facts of each case, which we review *de novo*. *Williams*, 2025 IL 129718, ¶ 43; *People v. Madison*, 2023 IL App (1st) 221360, ¶ 35.

¶ 39    In the present case, on appeal, the petitioner argues that his postconviction counsel provided unreasonable assistance by failing to raise an as-applied proportionate penalties challenge to his 50-year *de facto* life sentence and instead asserting a meritless eighth amendment, *Miller*-based claim. The petitioner asserts that postconviction counsel's actions were "especially egregious" because counsel was in possession of Dr. Garbarino's report and could have utilized it to support a proportionate penalties' claim.

¶ 40    The State responds that contrary to the petitioner's position, postconviction counsel did make a proportionate penalties' argument in the successive petition, and that, regardless, even if

he had not, that claim was not viable, such that dismissal of the petition was proper.

¶ 41    For the following reasons, we hold that while postconviction counsel rendered deficient representation by failing to assert a proportionate penalties' claim in the successive petition, the petitioner was not prejudiced by this failure, and remand for further proceedings is unnecessary.

¶ 42    At the outset, we note that contrary to the State's position, the record unequivocally shows that postconviction counsel never made a proportionate penalties argument before the circuit court. Instead, as drafted, the successive petition solely cited to the eighth amendment and case-law interpreting the federal constitution with respect to juvenile offenders (those under the age of 18) in arguing that the petitioner was entitled to a resentencing hearing. The State's motion to dismiss itself argued that all the decisions cited in the petition involved eighth amendment sentencing challenges by juvenile offenders, which did not apply to the petitioner as he was not a juvenile at the time he committed the instant offense, and were therefore not "applicable to his situation." Postconviction counsel made no response to this argument at the motion to dismiss hearing, and instead, simply reiterated the eighth-amendment arguments already raised in the successive petition, never mentioning the proportionate penalties clause. Accordingly, counsel acted unreasonably.

¶ 43    Nonetheless, because the circuit court, in its discretion, liberally construed the successive petition as asserting a proportionate penalties' claim in light of Dr. Garbarino's report and considered that claim in the context of a second stage proceeding before dismissing it, the petitioner suffered no prejudice.

¶ 44    Under the proportionate penalties clause of the Illinois Constitution all penalties must "be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11. A sentence violates the proportionate

penalties clause when, *inter alia*, the penalty imposed is " 'cruel, degrading, or so wholly disproportionate to the offense as to shock the moral sense of our community.' " *People v. Clark*, 2023 IL 127273, ¶ 51 (quoting *People v. Leon Miller*, 202 Ill. 2d 328, 338 (2002)).

¶ 45 This court has previously traced the history of our proportionate penalties clause jurisprudence as it relates to young adults serving life sentences, and we need not reiterate it fully again here. *People v. Horshaw*, 2024 IL App (1st) 182047-B ¶¶ 47-55. Suffice it to say, in *Thompson* and *Harris*, our supreme court initially "opened the door" for "emerging adult offenders" (who are 18 or 19 years old), such as the petitioner here, to demonstrate through an adequate factual record that their own "specific characteristics were so like those of a juvenile that imposition of a life sentence absent the safeguards established in *Miller* was cruel, degrading, or so wholly disproportionate to the offense that it shocks the moral sense of the community." *People v. Daniels*, 2020 IL App (1st) 171738, ¶ 25; see *Thompson*, 2015 IL 118151; *Harris*, 2018 IL 121932.

¶ 46 However, that precedent has changed, and more recently, our supreme court has severely curtailed the ability of young adult petitioners to raise such claims by way of successive petitions. See *Clark*, 2023 IL 127273, ¶¶ 24-26; *Moore*, 2023 IL 126461, ¶¶ 40-42. Specifically, in *Clark* and *Moore*, our supreme court held that "the essential legal tools" to raise a proportionate penalties' claim had always been available for petitioners during initial postconviction proceedings. See *Clark*, 2023 IL 127273, ¶ 93; *Moore*, 2023 IL 126461, ¶ 42. Because "*Miller* did not change the law applicable to young adults, it does not provide cause for the proportionate penalties challenges advanced" in a successive petition. *Moore*, 2023 IL 126461, ¶ 42.

¶ 47 In applying *Clark* and *Moore*, this appellate court has repeatedly observed that "*Thompson* and *Harris* opened the door only wide enough to accommodate [proportionate penalties'] claims

involving mandatory life sentences that were raised in initial postconviction petitions." *Horshaw*, 2024 IL App (1st) 182047-B, ¶ 62; see also *e.g. People v. Brewer*, 2025 IL App (1st) 240088, ¶¶ 29-30, *People v. Minniefield*, 2025 IL App (1st) 240463-U, ¶ 54; *People v. Handy*, 2025 IL App (1st) 231568-U, ¶ 58; *People v. Davis*, 2025 IL App (1st) 231499-U, ¶¶ 19, 24.

¶ 48    Our jurisprudence collectively now holds that such claims "should be viewed as nothing more than an extension of proportionate penalties claims that have existed all along," and that petitioners cannot rely on the unavailability of *Miller* or *Miller*-based proportionate penalties precedent as cause for failure to argue them in their initial postconviction proceedings. *Horshaw*, 2024 IL App (1st) 182047-B, ¶ 62 (citing *People v. Dorsey*, 2021 IL 123010, ¶ 74; *Clark*, 2023 IL 127273, ¶¶ 92-93; and *People v. Hilliard*, 2023 IL 128186, ¶ 28); see also *e.g. People v. McGee*, 2025 IL App (1st) 231591-U, ¶ 32; *People v. Scaggs*, 2025 IL App (1st) 240953-U, ¶ 49; *People v. Handy*, 2025 IL App (1st) 231568-U, ¶ 58; *People v. Jones*, 2025 IL App (5th) 230511-U, ¶ 38.

¶ 49    Under the narrow directive of *Clark* and *Moore*, we have also reluctantly applied this same rationale to the prior unavailability of neuroscientific research regarding the brains of young adults, such as the one provided here by Dr. Garbarino's report, and repeatedly rejected arguments that its unavailability provides the necessary cause for raising a proportionate penalties' claim in a successive petition. See *Scaggs*, 2025 IL App (1st) 240953-U, ¶¶ 46, 49-51; *People v. Robinson*, 2025 IL App (1st) 231419-U, ¶¶ 59, 62-63; *People v. Searles*, 2024 IL App (1st) 210043-U, ¶¶ 13-17. In doing so, we have explained that the factual basis for a sentencing challenge based on a petitioner's age "is that fully developed adults are different from young adults who are still developing," which is a distinction "Illinois courts have long recognized." *Searles*, 2024 IL App (1st) 210043-U, ¶ 17; *People v. Haines*, 2021 IL App 190612, ¶ 47. In particular, we found that in *Clark*, our supreme court clarified that "Illinois cases have long held that the proportionate

penalties clause required the circuit court to take into account the defendant's 'youth' and 'mentality' in fashioning an appropriate sentence" and that "[a]s far back as 1894, this court recognized that '[t]here is in the law of nature, as well as in the law that governs society, a marked distinction between persons of mature age and those who are minors' " and " '[t]he habits and characters of the latter are, presumably, to a large extent as yet unformed and unsettled.' " *Id.* ¶ 92 (quoting *People ex rel. Bradley v. Illinois State Reformatory*, 148 Ill. 413, 423 (1894)).

¶ 50    Under this precedent, it is apparent that the petitioner here could not establish the requisite cause for failing to raise a proportionate penalties' claim in his initial postconviction proceedings because such a claim "was always available" to him "in some form." *Horshaw*, 2024 IL App (1st) 182047-B, ¶ 62 (citing *Moore*, 2023 IL 12646, ¶¶ 40-42). The circuit court found as much when it liberally construed the successive petition as asserting a proportionate penalties' claim and dismissed that claim pursuant to *Moore* for failure to state cause. See *Bailey*, 2017 IL 121450, ¶ 26 (at the second stage of postconviction proceedings the State may "seek dismissal of the petition on any grounds, including the defendant's failure to prove cause and prejudice for not having raised the claims in the initial postconviction petition."). As such, the petitioner cannot show any prejudice stemming from postconviction counsel's failure to raise the proportionate penalties claim in his successive petition.

¶ 51    The petitioner nonetheless argues that based on *People v. Addison*, 2023 IL 127119, remand is necessary because once the circuit court construed the petition as asserting a proportionate penalties' claim, postconviction counsel should have argued ineffective assistance of appellate counsel to avoid dismissal of the successive petition on procedural grounds. We disagree and find that case inapposite.

¶ 52    In *Addison*, our supreme court addressed whether appointed postconviction counsel

comported with the requirements of Rule 651(c) when he amended the petitioner's *pro se* petition to omit ineffective assistance of appellate counsel claims that the *pro se* petitioner had himself alleged and which were necessary to avoid forfeiture of several of his claims. *Id.* ¶¶ 23-25. The court held that under the unique facts of that case, in which postconviction counsel had "made the petition worse by amending it," remand was required regardless of the petition's merit. *Id.* ¶ 24.

¶ 53    Unlike in *Addison*, as already set forth above, Rule 651(c) requirements are inapplicable here because privately retained counsel drafted the pleading that initiated the postconviction proceeding. See *People v. Perry*, 2024 IL App (1st) 230167-U, ¶ 29 (applying the "*Strickland*-like analysis" set forth in *Zareski* and fining *Addison* inapplicable, where Rule 651(c) did not apply). Moreover, this is case does not present the "unusual situation" where counsel "made the *pro se* petition worse" by "eliminat[ing] the necessary allegations that [the petitioner] had included in the *pro se* petition." *Addison*, 2023 IL 127119, ¶ 24. In addition, unlike in *Addison*, where arguing ineffective assistance of appellate counsel would have prevented forfeiture of the claims, here making the same argument could not have overcome the procedural hurdle created by *Clark* and *Moore*, since the petition was a successive one, and any failures by appellate counsel would have been irrelevant to explaining why the petitioner did not raise his proportionate penalties claim in his initial postconviction petition. Accordingly, *Addison* does not apply.

¶ 54                                    III. CONCLUSION

¶ 55    For the foregoing reasons, we find that the petitioner has failed to show that postconviction counsel provided unreasonable assistance. *Zareski*, 2017 IL App (1st) 150836, ¶ 59. We therefore affirm the judgment of the circuit court.

¶ 56    Affirmed.